IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                          CRIMINAL NO. 3:16-CR-00073-DPJ-LRA-3

MARCUS SHELBY


**SENTENCING HEARING**


BEFORE THE HONORABLE DANIEL P. JORDAN III
UNITED STATES DISTRICT JUDGE
JULY 6TH, 2017
JACKSON, MISSISSIPPI


APPEARANCES:

FOR THE GOVERNMENT:   MR. JERRY L. RUSHING

FOR THE DEFENDANT:    MR. JOSEPH M. HOLLOMON


REPORTED BY:  MARY VIRGINIA "Gina" MORRIS, RMR, CRR

_____

501 E. Court, Suite 2.500
Jackson, Mississippi  39201
(601) 608-4187

```
 1                          TABLE OF CONTENTS

 2

 3   JEREMIAH RAYNER

 4     Direct Examination By Mr. Rushing  ...................9

 5       Exhibits G-1, G-2(A) AND G-2(B)  ................12

 6     Cross-Examination By Mr. Hollomon  .................17

 7   STACY JONES

 8     Direct Examination By Mr. Rushing  .................20

 9       Exhibits G-3 THROUGH G-9  .......................22

10     Cross-Examination By Mr. Hollomon  .................28

11   ELMO TOWNSEND

12     Direct Examination By Mr. Rushing  .................32

13     Examination by By The Court  .......................39

14     Cross-Examination By Mr. Hollomon  .................39

15   KEVIN DEAR

16     Direct Examination By Mr. Rushing  .................51

17     Cross-Examination By Mr. Hollomon  .................56

18   SEMIYA SHELBY

19     Direct Examination By Mr. Hollomon  ................78

20   HARRISON ROZELL

21     Direct Examination Mr. Hollomon  ...................79

22       Exhibit G-10  ..................................83

23

24

25
```

```
 1              THE COURT:  Thank you.  You may be seated.  All right,
 2    Mr. Rushing.
 3              MR. RUSHING:  Yes, Your Honor.  Your Honor, on the
 4    docket today we have the United States v. Marcus Shelby.  It's
 5    cause number 3:16cr73DPJ-LRA.  We're present before the court
 6    today for sentencing as to Count 1 of the indictment.  The
 7    defendant is present in court and represented by the Honorable
 8    Joe Hollomon, Your Honor.
 9              THE COURT:  All right.  Thank you.  Mr. Hollomon.
10              MR. HOLLOMON:  Good morning, Your Honor.  Good
11    afternoon, rather.
12              THE COURT:  All right.  Mr. Shelby, have you had a
13    chance to read the presentence report and the addendum to that
14    report?
15              THE DEFENDANT:  Yes, sir.
16              THE COURT:  Did you have a chance to go through those
17    documents with Mr. Hollomon?
18              THE DEFENDANT:  Yes, sir.
19              THE COURT:  And was he able to answer any questions
20    that you had about what's contained in those documents?
21              THE DEFENDANT:  Yes, sir.
22              THE COURT:  Okay.  Is there anything in either
23    document that you're still unsure about?
24              THE DEFENDANT:  No, sir.
25              THE COURT:  Okay.  All right.  You can return to your
```

```
 1   seat.  Mr. Hollomon, why don't you stay there for a minute.
 2   Mr. Hollomon -- I'm sorry.  Come back.
 3        MR. HOLLOMON:  I'm sorry, Your Honor.
 4        THE COURT:  All right.  Mr. Hollomon, there was an
 5   initial objection that I think is in the record received
 6   March 24th, 2017.  You thereafter filed a supplemental set of
 7   objections and then supplemented that with some case authority.
 8   I think I have a clean copy.  Was June 20th your final
 9   submission?
10        MR. HOLLOMON:  I believe that's correct, Your Honor.
11   Yes.
12        THE COURT:  Okay.  And as I read it -- tell me if I'm
13   wrong, but it -- it's substantively the same as your first
14   memo, but you've added some -- you haven't taken anything out,
15   but you've added some argument and some authority.
16        MR. HOLLOMON:  I have, Your Honor.
17        THE COURT:  Okay.  Would you like for me to make this
18   memorandum a part of the record?
19        MR. HOLLOMON:  Please, Your Honor.
20        THE COURT:  Okay.  And that was a horrible way of
21   saying, is there any need to make your first memo a part of the
22   record also?
23        MR. HOLLOMON:  I don't think so, Your Honor.  I think
24   this incorporates, as the court said, everything that was in
25   the first.
```

1          THE COURT:  All right.  So we'll attach that to the

2    record.  And, Mr. Rushing, I'll likewise attach your memorandum

3    in response.

4          MR. RUSHING:  Yes, Your Honor.  No objection.

5          THE COURT:  All right.  Mr. Hollomon, there are

6    obviously several objections we need to go through.  Unless you

7    or Mr. Rushing suggest something different, I guess I propose

8    just to sort of take them in order one at a time.

9          The first one was actually I guess filed before you

10   were retained and it relates to paragraph 35 and the quantity.

11   That was not included in your brief.  Is that issue still under

12   consideration?

13         MR. HOLLOMON:  It is not, Your Honor.  And I would ask

14   my client -- I think he will affirm that.  We concede after

15   reviewing the relevant conduct rules and going over that with

16   my client, I believe he is prepared to concede that the finding

17   of offense level 26 is correct.

18         THE COURT:  All right.  Mr. Shelby, is that correct?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  I'm sorry.  You have to speak in the

21   microphone.

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  All right.  Obviously, I think that's the

24   correct thing to do.  It's obviously relevant conduct and it's

25   established.

1          MR. HOLLOMON:  Thank you.

2          THE COURT:  The next one, there was an initial

3    objection, and I think you fleshed it out more in your

4    subsequent memorandum.  But with respect to paragraph 36 the

5    defendant initially said that he did not commit the offense

6    alleged in paragraph 36.  Paragraph 36 is where there's a

7    two-point upward adjustment under 2D1.1(b)(1) regarding the

8    firearm.  So would you like to take that one up now?

9          MR. HOLLOMON:  Yes, Your Honor.  We -- without

10   rehashing the -- our basis, we take the position -- and I would

11   note this at the outset, Your Honor.  My client is not denying

12   the underlying conduct for which he pled guilty, and that is

13   the possession of these drugs.  However, he does dispute

14   knowledge of a firearm being in the car which is a car that did

15   not belong to him which he had been driving.  It belonged to

16   the codefendant, Nunez-Belmonte.

17          And I -- as Probation Officer Ms. Sullivan noted in

18   the presentence investigative report, there was a similar car

19   listed as an asset on my -- for -- on behalf of my client.

20   However, that was a different Toyota automobile of a different

21   color and is not the same one that's mentioned here.

22          We argued and submitted to the court that the gun was

23   found at a later time after he had abandoned the car, and

24   there's no proof to show that he actually knew the firearm was

25   in the car at the time of the commission of the offense.

1          THE COURT:  All right.  Is there any additional

2     evidence that you want to put on?

3          MR. HOLLOMON:  No, Your Honor.

4          THE COURT:  Okay.  All right, Mr. Rushing.

5          MR. RUSHING:  Yes, Your Honor.

6          THE COURT:  Would you like to respond?

7          MR. RUSHING:  Your Honor, I do have some witnesses

8     here to testify concerning the gun and also the vehicles

9     themselves too.

10          THE COURT:  Okay.

11          MR. RUSHING:  I don't know how the court wants to do

12     that, whether he wants me to call witnesses as to each

13     objection or take the testimony of each witness as to each

14     particular issue.

15          THE COURT:  I see.  So the testimony that they would

16     have today is going to overlap.

17          MR. RUSHING:  Yes, sir.  It concerns the actual

18     firearm and also with the car being possessed by the defendant

19     on more than one occasion.

20          THE COURT:  Okay.  Why don't we do this -- and,

21     Mr. Hollomon, you let me know if this causes you any

22     heartburn -- but I guess let's identify the objections to which

23     you want to put on evidence, and then just go ahead and let

24     that witness give his or her testimony, and then we can argue

25     the individual objections after that.  Does that make sense?

1          MR. RUSHING:  Yes, Your Honor.

2          MR. HOLLOMON:  It does, Your Honor.

3          THE COURT:  All right.  So which objections will these

4   witnesses address?

5          MR. RUSHING:  Your Honor, I have witnesses to

6   address -- I have witnesses to address each issue that the

7   defendant has raised.  The first issue concerns the actual

8   possession of the firearm itself.

9          THE COURT:  Well, if it's all of them, then that's

10  pretty descriptive.

11         MR. RUSHING:  Yes, sir.

12         THE COURT:  Okay.  Go ahead and call your first

13  witness.

14         MR. RUSHING:  Call Jeremiah Rayner, Your Honor.

15     (WITNESS WAS ADMINISTERED THE OATH)

16         MR. RUSHING:  Let me stand corrected on that if you

17  don't mind.  I said we object to everything -- or witnesses

18  concerning each objection; but I do think, Your Honor, we

19  conceded the objection about the additional criminal history

20  point for the misdemeanor conviction on that also.  So we won't

21  be arguing that, Your Honor.

22         THE COURT:  Okay.

23                      **JEREMIAH RAYNER,**

24  having first been duly sworn, testified as follows:

25                     **DIRECT EXAMINATION**

BY MR. RUSHING:

Q.  State your name, please, sir, for the record.

A.  Jeremiah Rayner, R-A-Y-N-E-R.

Q.  And, Mr. Rayner, where are you employed, sir?

A.  Drug Enforcement Administration.

Q.  In what capacity?

A.  I'm a special agent.

        MR. RUSHING:  May I have a second, Your Honor?

        THE COURT:  Yes.

    (COUNSEL CONFERRED)

        MR. HOLLOMON:  Judge, for the record we do invoke the

rule.

        THE COURT:  Okay.

        MR. RUSHING:  Mr. Rayner would be the case agent for

us and ask that he remain in the courtroom during the time

period.

        THE COURT:  Of course.

BY MR. RUSHING:

Q.  Mr. Rayner, who do you work for, sir?

A.  The Drug Enforcement Administration.

Q.  And in what capacity?

A.  I'm a criminal investigator, special agent.

Q.  And were you an investigator back in around September 2000,

I guess, 16?  Is that correct?

A.  Yes.

1  Q.  And were you involved in the surveillance at that time of

2  Mr. Marcus Shelby and also Charlie Martin?

3  A.  Yes, sir.

4  Q.  And I want to call your attention to September the 4th.  Is

5  that 2016 or 2015?  Do you recall?

6  A.  I believe it was '15.

7  Q.  Did you have an occasion on that particular day to see

8  Mr. Marcus Shelby?

9  A.  Yes, I did.

10 Q.  And do you see that person in court here today, sir?

11 A.  I do.

12 Q.  And is that the defendant here today?

13 A.  Yes, it is.

14 Q.  And if you would, just tell the court how you first became

15 aware of Mr. Shelby on September the 4th of that year.

16 A.  We were conducting some wiretaps on individuals in the

17 Jackson area.  Mr. Shelby had been intercepted as being a

18 source of supply for cocaine for Charlie Martin.

19    Mr. Shelby had a flat tire that day.  Some reason he

20 couldn't fix it or didn't have a spare, and he called Charlie

21 Martin who owns a tow truck to come get him and tow his

22 vehicle.  And Charlie Martin responded to where he was.  I also

23 went out on surveillance and observed Charlie Martin load up

24 the silver Avalon with Marcus Shelby present as well and

25 photographed it.

1         (COUNSEL EXAMINED DOCUMENTS)

2              MR. RUSHING:  May I approach the witness, Your Honor?

3              THE COURT:  Yes.

4    BY MR. RUSHING:

5    Q.  Mr. Rayner, I'm showing you three photographs.  Is that

6    correct?

7    A.  Yes, sir.

8    Q.  And they're marked Exhibit 1, 2(a) and 2(b).  Is that

9    correct?

10   A.  Yes, sir.

11   Q.  And have you seen those photographs before, sir?

12   A.  Yes.

13   Q.  And what are those photographs?

14   A.  One's of Charlie Martin, his tow truck with the silver

15   Avalon on it with Marcus Shelby standing next to it.  Another

16   one is Marcus Shelby getting out of the Toyota Avalon that is

17   on -- on the tow truck.  He's getting out of the driver's side

18   door.  Another one is a tow truck -- a photograph of the

19   license plate once it's on the tow truck.

20   Q.  And was this back in September 2015?  Is that correct?

21   A.  Yes, sir.

22   Q.  You're conducting your surveillance at that time period?

23   A.  Yes.

24   Q.  And had you received any word about Mr. Shelby calling

25   Mr. Martin for that purpose?

1   A.   For the purpose of the tow?

2   Q.   Yes.

3   A.   Yes, sir.

4   Q.   And do those photographs fairly and accurately show the --

5   I guess the car that Mr. Shelby was driving that particular

6   day?

7   A.   Yes, it does.

8           MR. RUSHING:  Your Honor, the government would offer

9   Exhibit 1, 2(a) and 2(b) in evidence for this hearing only, of

10  course.

11          THE COURT:  Any objection?

12          MR. HOLLOMON:  No objection.

13          THE COURT:  They're admitted.

14     (EXHIBITS G-1, G-2(A) AND G-2(B) MARKED)

15          MR. RUSHING:  I want to first show Exhibit Number

16  2(a), Your Honor, I believe.

17  BY MR. RUSHING:

18  Q.   And can you see that photograph in front of you?

19  A.   Yes.

20  Q.   And can you tell us, there's a vehicle on top of the tow

21  truck.  Is that correct?

22  A.   Yes, there is.

23  Q.   And what color is that vehicle?

24  A.   Silver or gray.

25  Q.   And there's someone getting out of the vehicle.  Can you

1  see that person?

2  A.  Yes.  There's a bit of a glare on the screen.  It's Marcus

3  Shelby.

4  Q.  That's the defendant here today?

5  A.  Yes.

6  Q.  I want to show you also Exhibit Number 1, now.  Can you see

7  that?

8  A.  Yes.

9  Q.  And, again, what does that photograph show?

10  A.  Again, it shows the tow truck with the Toyota Avalon on the

11  back and Marcus Shelby standing near it.

12  Q.  And where is Mr. Shelby?  Can you see -- can you point to

13  him on the screen for us?

14  A.  He's on the left side of the screen.

15  Q.  And did you follow the vehicle as it was towed off away

16  from the scene?

17  A.  I did.

18  Q.  And I want to show you Exhibit Number 2(b).  And can you

19  see that photograph?

20  A.  I can.

21  Q.  And what is that, sir?

22  A.  That's a photograph of the vehicle being towed.  I was

23  attempting to get the license plate, but it has a cover over it

24  and it's hard to see.  But I was trying to get a closer picture

25  of the license plate on the vehicle.

1   Q.  And is that the same vehicle that you saw Mr. Shelby in

2   earlier that day?

3   A.  Yes.

4   Q.  Were you involved in the surveillance on Mr. Shelby when he

5   was tried to be apprehended by the -- or stopped, rather, by

6   the highway patrol?

7   A.  Yes, I was.

8   Q.  And what were you doing that particular day, sir?

9   A.  We had intercepted calls between an individual, Marcus

10  Shelby, and Jose Nunez-Belmonte, who was a cocaine source of

11  supply in Jackson.  They were supposed to be meeting at their

12  house -- at one of Jose's stash houses to provide him with

13  kilogram quantities of cocaine, to provide Marcus Shelby with

14  kilogram quantities of cocaine.

15  Q.  Were you able to surveil or see the Chev- -- or the Avalon

16  vehicle, rather, that Mr. Marcus Shelby was driving that day, I

17  mean?

18  A.  I'm sorry.  Repeat --

19  Q.  Did you see the vehicle that Mr. Shelby was driving that

20  day?

21  A.  I did.

22  Q.  And what was that, sir?

23  A.  It was a silver Toyota Avalon.

24  Q.  And did that resemble the Avalon that you saw him back in

25  September of 2015?

A.   It did.

Q.   And was that vehicle subsequently stopped by the highway

patrol?

A.   Yes, they did.   They stopped --

Q.   Were you there when the vehicle got stopped by the highway

patrol?

A.   I was not.

Q.   Were you able to later see that vehicle?

A.   I was.

Q.   And where did you see it later on that day at?

A.   Once the vehicle fled the scene, it was a long pursuit.

The vehicle was eventually abandoned at a house and I saw it at

the house.

Q.   Do you know how long it was from the time that the vehicle

fled the scene until the vehicle was later found abandoned?

A.   It was approximately 50 minutes.   The chase lasted 40 to 45

minutes and the vehicle was located in approximately five

minutes.

Q.   And did you go and see the vehicle that was abandoned?

A.   I did.

Q.   And was it the same Avalon?

A.   Appeared to be, yes, sir.

Q.   Now, during the time -- you previously said you were -- had

some wire intercepts on Mr. Belmonte.   Is that correct?

A.   That's correct.

Q.  After the defendant was stopped -- well, tried to be

stopped that day by the highway patrol, did you hear any

conversation between Mr. Shelby and Belmonte about that same

vehicle?

A.  Yes, I did.  We intercepted several calls -- multiple calls

over the wire regarding what occurred between Marcus Shelby and

the officer.  And he also had instructed it -- the calls

indicated that he had purchased the car from Jose Nunez.

Q.  And when you say "he," who are we talking about?

A.  Sorry.  Marcus Shelby had purchased the car from Jose

Nunez.  And he was instructing Nunez to report the car stolen

from his lot, from Nunez's lot, because Nunez sold cars.

Q.  Did he indicate why he wanted that done?

A.  No, sir, I don't believe so.

        THE COURT:  I'm sorry, Mr. Rushing.  Let me get some

dates in here.

        MR. RUSHING:  Yes, sir.

        THE COURT:  The flat tire was September 4th, 2015.

The subsequent surveillance and stop, was that October?

        THE WITNESS:  October 24th, 2015, I believe.

        THE COURT:  Okay.  And then the conversation you're

talking about right now, is that later in the same day?

        THE WITNESS:  I don't recall the exact date.

        THE COURT:  It was --

        THE WITNESS:  It was in that same area, that same time

1  frame.  The day of, a couple of days later, somewhere around

2  there.

3          THE COURT:  But it was after the stop and the chase.

4          THE WITNESS:  The talk regarding the car, yes, sir,

5  was after the chase.

6          THE COURT:  Okay.  Thank you.

7  BY MR. RUSHING:

8  Q.  You're talking about the talk between Mr. Belmonte and

9  Mr. Shelby.  Is that correct?

10 A.  Yes.

11 Q.  Now, were there conversations about trying to allege that

12 the car -- the vehicle had been stolen?  The Avalon, is that

13 the one we're talking about?

14 A.  Yes.

15         MR. RUSHING:  Tender the witness, Your Honor.

16                        **CROSS-EXAMINATION**

17 BY MR. HOLLOMON:

18 Q.  Agent Rayner, my name is Joe Hollomon.  I represent Marcus

19 Shelby.  Were you the agent who was assigned to this case?

20 A.  Yes, sir, I was the primary case agent.

21 Q.  Okay.  All right.  But you were not there when the stop

22 occurred in October of 2015.

23 A.  I was in the area.  I wasn't -- I didn't physically see the

24 stop itself.  No.

25 Q.  Okay.  All right.  Now, this silver Toyota Avalon that is

1  depicted in these photographs, Exhibit 1, 2(a) and 2(b), did

2  you ever determine who that vehicle was registered to?

3  A.  I don't recall.

4  Q.  Was it registered to Marcus Shelby?

5  A.  No, I don't believe so.  The tag was very -- the license

6  plate cover on the tag hindered us from being able to run it.

7  We tried several different ways, but it came back no record

8  found.  So it was not registered to him on the tag.

9  Q.  It wasn't registered to Marcus.

10 A.  There was no record of it.

11 Q.  Okay.  All right.  Now, you said I think, Mr. Rayner, there

12 was about -- Agent Rayner -- I'm sorry -- there was about 50

13 minutes between the stop and the time the car was later found

14 on Horton Drive.  Is that correct?

15 A.  There was -- from the time it was -- yes.  The pursuit

16 lasted about 40 to 45 minutes, and it was about five minutes

17 until we found the car.

18 Q.  Were you involved in that pursuit?

19 A.  No, I was not.  I was -- I mean, I was parallelling it, but

20 I was a good ways away.

21 Q.  So you didn't actually see the vehicle from the time of the

22 stop until it was found.

23 A.  I did not see it until it was found.

24 Q.  Okay.

25 A.  That's correct.

```
1    Q.  And what role did you play in finding the vehicle?

2    A.  We all were canvassing the area.  Once marked units took

3    over the pursuit, the vehicle fled into an area.  They lost the

4    vehicle.  Then we all began to flood into the area to look for

5    the vehicle.  Someone called out the vehicle's location.  We

6    stopped and secured the area.

7    Q.  Did you participate in the search of the vehicle?

8    A.  No, I did not.  Did not.

9    Q.  You don't know what was in the vehicle or taken out of the

10   vehicle.

11   A.  I remember looking in a vehicle, but I didn't physically

12   search through the vehicle.

13   Q.  When you looked in the vehicle, did you see anything that

14   caught your attention?

15   A.  Yeah.  I remember someone mentioned that there was a

16   weapon.

17   Q.  Did you see a weapon when you looked into the vehicle?

18   A.  I can't remember if I saw the weapon or not.  Seems like I

19   did, but I'm not 100 percent sure.

20   Q.  Okay.  You didn't recover a weapon.

21   A.  I did not.

22   Q.  Okay.

23   A.  We called crime scene to process the vehicle.

24   Q.  Okay.  All right.

25        MR. HOLLOMON:  I think that's all I have, Your Honor.
```

```
 1            THE COURT:  All right.  Any redirect?

 2            MR. RUSHING:  No, Your Honor.

 3            THE COURT:  All right.  Thank you.

 4            MR. RUSHING:  Government next calls Stacy Jones.

 5                           STACY JONES,

 6    having first been duly sworn, testified as follows:

 7                         DIRECT EXAMINATION

 8    BY MR. RUSHING:

 9    Q.  Would you state your name for the record, please.

10    A.  My name is Stacy Jones.  S-T-A-C-Y J-O-N-E-S.

11    Q.  Ms. Jones, where are you employed?

12    A.  I'm employed with the Mississippi Bureau of Investigation,

13    which is the investigative division of the Mississippi Highway

14    Patrol.

15    Q.  And what is your job with that agency?

16    A.  I'm a forensic scientist who specializes in crime scene

17    analysis.

18    Q.  I want to call your attention to around October 25th, 2015,

19    and ask you were you called out to respond to a traffic stop by

20    a Patrolman Townsend.

21    A.  Yes, sir.  I was called out by my captain, L.A. Oliver, but

22    yes, to that -- to that incident.

23    Q.  And why were you called out?

24    A.  To examine the vehicle involved.

25    Q.  And if you would, just tell us, when did you first see that
```

1    vehicle that was involved in that particular incident?

2    A.  On the --

3            THE WITNESS:  Your Honor, may I refer to my notes?

4            THE COURT:  You may.

5    A.  On October the 26th at 12:51 midday is when the -- when we

6    arrived to the vehicle, it was secured at the criminal

7    information center, which is in Pearl.

8    BY MR. RUSHING:

9    Q.  And whose -- I guess the information center there, who is

10   that run by?

11   A.  By the department of public safety.

12   Q.  And from the time the vehicle had been seized, as far as

13   you know, until the time you examined it, had it been secured

14   for that area?

15   A.  Yes.  There was yellow tape around it, and it was in a

16   warehouse that -- that we used several times for vehicles.

17   It's secured both electronically and with video.

18   Q.  And did you, in fact, examine that vehicle?

19   A.  I did.

20           MR. RUSHING:  May I approach the witness, Your Honor?

21           THE COURT:  Yes.

22       (DOCUMENT TENDERED TO WITNESS)

23   BY MR. RUSHING:

24   Q.  I want to hand you a number of photographs, if you don't

25   mind.  And if you would, just look through those.  If you can,

1   just give a brief description of what they are.  Don't tell us

2   what each one is, but can you tell us what those are?

3   A.  They are photographs taken by me of the vehicle and also

4   some items that were inside the vehicle.

5   Q.  Do those photographs fairly and accurately show the vehicle

6   that you examined as well as the contents of that vehicle when

7   you examined it back on October 26th, 2015?

8   A.  Yes, sir, it does.

9   Q.  And what's the first number on that exhibit and go to the

10  last number also?

11  A.  It's Government's Exhibit Number 3 through --

12  Q.  9?  Is that correct?

13  A.  9.

14          MR. RUSHING:  At this time the government would offer

15  3 through 9 into evidence, Your Honor.

16          THE COURT:  Any objection?

17          MR. HOLLOMON:  No objection, Your Honor.

18          THE COURT:  All right.  They're admitted.

19      (EXHIBITS G-3 THROUGH G-9 MARKED)

20  BY MR. RUSHING:

21  Q.  If you would, just describe the procedure you go through

22  when you began your examination of the vehicle.

23  A.  The vehicle was documented.  We -- we document any

24  identifying numbers, the VIN numbers and such as that.  We

25  photograph the vehicle in an unaltered state, which is before

 1    anything is touched or moved or altered in any kind of way.

 2        The vehicle was examined for the possible presence of

 3    epithelial cells, which is skin cells, to identify the

 4    occupants or driver or whoever may or may not have been in the

 5    vehicle.

 6        The -- we also did -- I'm sorry.

 7        (WITNESS EXAMINED DOCUMENT)

 8    A.  -- a full inventory of the vehicle, everything included in

 9    the vehicle.  And then items were taken for both forensic value

10    and investigative value.  We processed the exterior of the

11    vehicle for latent prints of value also.

12    Q.  What kind of vehicle were you examining, was that vehicle

13    listed as?

14    A.  I'm sorry.  I didn't --

15    Q.  What kind of -- what kind of vehicle, the type,

16    manufacturing, model --

17    A.  Oh, I'm sorry.

18    Q.  -- of the vehicle?

19    A.  It was identified as a silver in color 2006 four-door

20    Toyota Avalon, and there was no tag present.

21    Q.  I want to show you Exhibit Number 3.  And can you describe

22    what that shows, please?

23    A.  That's photograph of the -- of the vehicle taken from the

24    passenger front quarter -- quarter panel angle of the vehicle

25    that shows heavy damage on that front passenger side quarter

1  panel and some damage to the mirror.

2  Q.  I want to show you Exhibit Number 4 next I believe.  And

3  can you identify that exhibit also?

4  A.  It's the same area of damage, just a little bit closer.

5  Q.  And Exhibit Number 5?

6  A.  It's a photograph of the vehicle showing that there's

7  yellow tape securing the area of the vehicle.  And the

8  photograph is taken from the driver rear quarter panel area

9  showing the driver's side of the vehicle.

10  Q.  And does it also show I guess this was a Toyota?  Is that

11  correct?

12  A.  Yes, sir.

13  Q.  Is there another emblem underneath the "Toyota" part of the

14  vehicle?

15  A.  Yes, sir.  I'm assuming that it's a dealership

16  identification.  It's not legible in this picture.

17  Q.  And in Exhibit -- let me ask you this.  As you began to

18  examine the vehicle, did you see any -- conduct examination I

19  guess of the interior of that vehicle also?

20  A.  I did.

21  Q.  Did that include -- did you photograph the vehicle inside

22  before you actually took anything out of the vehicle?

23  A.  Yes, sir.

24  Q.  I want to show you Exhibit Number 6.  Can you identify that

25  for us, please?

```
 1    A.  That's a medium-range photograph that was taken in the
 2    driver's seat of the vehicle.  There is -- you can see the
 3    console that is open as well as right by the -- the seat belt
 4    connector is actually the butt of a handgun.
 5    Q.  And was that obvious when you opened the door and saw --
 6    and looked inside the vehicle?  You could see the gun at that
 7    point in time?
 8    A.  Yes.  You could see the butt of the vehicle (sic).  Now,
 9    whether it's known -- I'm sorry.
10    Q.  The butt of --
11    A.  -- the gun --
12    Q.  -- the gun?
13    A.  -- of the gun, yes.  But the only thing that is visible is
14    the very bottom of it.
15    Q.  Now, the seat that we're looking at right there with a -- I
16    guess with the seat belt apparatus, is that the driver's side
17    of the vehicle?
18    A.  That is the driver's seat.
19    Q.  So the gun was --
20    A.  Driver side front seat.
21    Q.  -- located between the console and the driver's seat?
22    A.  That's correct.
23         THE COURT REPORTER:  One at a time, please.  Repeat
24    that last part.
25         MR. RUSHING:  And the driver's seat.
```

1    A.   Yeah.   It was just stuck down.

2    BY MR. RUSHING:

3    Q.   Is that correct?

4    A.   That's correct.

5    Q.   And did you actually take the -- remove that firearm from

6    that location?

7    A.   I did.

8    Q.   I want to show you Exhibit Number 7 and ask you, are you

9    familiar with that?

10   A.   That's correct.

11   Q.   And what is that, ma'am?

12   A.   That's the firearm that I removed from between the driver's

13   front seat and the console.

14   Q.   Do you recall what kind of firearm that was?

15   A.   Yes, sir.   It's a Ruger LGR .22 caliber.   And it's -- it's

16   stamped "WMR Sturm, Ruger & Company" with a serial number of

17   548-70700, manufactured in Newport, New Hampshire.

18   Q.   As you examined the interior of the vehicle also, did you

19   find any cards or invitations inside the vehicle?

20   A.   I did.   Between --

21   Q.   I want to -- I want to show you Exhibit Number 10, then,

22   see if you can describe that for us.

23   A.   Yes, sir.   This is a wedding invitation; and it was

24   located, again, stuck between the passenger front seat and the

25   console.   And it's a wedding invitation with the names

1    Constance Burgess and Marcus Shelby.

2    Q.   That was located in what part of the car?

3    A.   It was collected from between the passenger front seat and

4    the console.

5    Q.   I want to show you Exhibit Number 8.  And can you

6    identify -- it's all there -- identify what that shows, please,

7    ma'am?

8    A.   It's a photograph of the front of the vehicle.  And it's

9    just showing and documenting some damage to the driver's front

10   side.

11   Q.   And what do you see on the driver's front side?  What kind

12   of damage did you notice when you were conducting your

13   investigation?

14   A.   Just heavy scratches and some dents and some break in

15   the -- in the bumper portion.

16   Q.   I want to show you Exhibit Number 9 also.  And can you

17   describe -- is that another photograph that you took?

18   A.   Yes.  It's the same photograph just showing a little bit

19   further on around the front bumper and the damage on that side

20   too.

21   Q.   Did that damage that you've documented on that vehicle, did

22   it appear to be old damage or new damage?

23         MR. HOLLOMON:  If the court please, object unless

24   there's a predicate laid.

25         THE COURT:  Sustained.

BY MR. RUSHING:

Q.  Have you had the chance to go through any type of training to document either damage to vehicles, current damage or old damage to vehicles?

A.  No.  I would document if rust was present.

Q.  Did you see rust?

A.  No.

Q.  Did you see any paint on that vehicle that was -- when I say "paint," not necessarily the vehicle's -- that vehicle's paint itself but possible paint of another vehicle on that bumper?

A.  Transfer?  I'm -- that's going to be difficult for me to say from a photograph.

Q.  Okay.

        MR. RUSHING:  Tender the witness, Your Honor.

        THE COURT:  All right.  Cross.

        MR. HOLLOMON:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. HOLLOMON:

Q.  Ms. Jones, my name is Joe Hollomon.  I represent Marcus Shelby.  I want to ask just a few questions in response to your direct testimony.  Did you say earlier that you first got a call about this case on October 24th?

A.  No, sir.  I was notified on the 26th of October at 5:50 in the morning.

1  Q.  Okay.  I'm sorry.  And you were nowhere around when this

2  vehicle was damaged, were you?

3  A.  No, sir.

4  Q.  And you didn't see it damaged.

5  A.  No, sir.  This vehicle was brought to a location for me

6  to -- to examine after the incident.

7  Q.  Right.  And you didn't see the incident?

8  A.  No, sir.

9  Q.  You don't know how long the vehicle -- what damages

10  occurred during this alleged incident and what damages had

11  already been done to the vehicle.

12  A.  I do not.

13  Q.  Okay.  And you're not saying that you do.

14  A.  No.

15  Q.  Okay.  Now, you were not there when the vehicle was

16  initially recovered.

17  A.  No, sir.

18  Q.  You saw it later when it had been transported and the

19  evidence tape put around it for you to do your work.

20  A.  That's correct.

21  Q.  Okay.  Now, you identified in Exhibit 6 I believe the butt

22  of a gun stuck between the driver's seat and the console in the

23  car.

24  A.  Yes, sir.

25  Q.  Right?  And that, apparently, is visible there --

1    A.    Yes.

2    Q.    -- is it not?  But by the time you had received the vehicle

3    other people had had access to the vehicle.  Correct?

4    A.    I -- I can't say whether -- I can't answer that.  I wasn't

5    there.

6    Q.    Okay.  Well, do you know if that gun appeared that way at

7    the time of the incident or if it had been moved?

8    A.    No.

9    Q.    Can you say under oath?

10   A.    I can only testify to what I was given, not any -- at any

11   point in time before that, no.

12   Q.    Okay.  So you don't know where the gun was located at the

13   time the vehicle was recovered or at the time of this incident.

14   A.    I can't testify to that.  No, sir.

15   Q.    You could only say where you saw it on the 26th.

16   A.    That's correct.

17   Q.    Okay.  Now, you don't know how the gun got in there, do

18   you?

19   A.    I would have no knowledge of that, no, sir.

20   Q.    You don't know who put it there.

21   A.    I do not.

22   Q.    And the same would be true about the wedding invitation.

23   You don't know how it got there.

24   A.    I would have no knowledge of anything prior to the

25   unaltered examination that I -- that I performed on that day.

1  Q.  Don't know how long it had been there, do you?

2  A.  I cannot --

3  Q.  Okay.  Same is --

4  A.  -- cannot say.

5  Q.  -- true of the gun.

6  A.  Yes, sir.

7  Q.  Okay.  All right.  Now, you said you checked for epithelial

8  cells as well as latent fingerprints.  Did you find any of

9  value?

10  A.  There was no latent prints of value, no, sir.

11  Q.  Okay.  What about epithelial cells?

12  A.  Once we processed them and turned them into the crime

13  laboratory, then I don't have -- I would not have knowledge of

14  their examination.  Then another analyst takes --

15  Q.  Okay.  You just --

16  A.  -- the examination to process it.

17  Q.  You just tested for it and submitted it for testing.

18  A.  Yes, sir.

19  Q.  Okay.

20          MR. HOLLOMON:  That's all I have, Your Honor.

21          THE COURT:  All right.  Thank you.  Redirect?

22          MR. RUSHING:  No, Your Honor.

23          THE COURT:  All right.  Thank you.  You can step down.

24  Who's next?

25          MR. RUSHING:  Government calls Elmo Townsend, Your

1    Honor.

2                            **ELMO TOWNSEND,**

3    having first been duly sworn, testified as follows:

4                         **DIRECT EXAMINATION**

5    BY MR. RUSHING:

6    Q.  Would you state your name, please, sir?

7    A.  Trooper Elmo Townsend.

8    Q.  And, Mr. Townsend, it's kind of obvious, but where do you

9    work, sir?

10   A.  Department of Public Safety, Mississippi Highway Patrol.

11   Q.  And for how long there, sir?

12   A.  Going on 22 years now.

13   Q.  And what do you do with the highway patrol?

14   A.  Right now I'm the director over the criminal patrol unit

15   and the explosive detection K-9s.

16   Q.  Back in October of 2015, what were you doing back then?

17   A.  Patrolling over the criminal patrol unit.  And I patrol

18   too.

19   Q.  Were you contacted by either the DEA or the MBN that day to

20   assist in the stop of a vehicle?

21   A.  Yes, sir.

22   Q.  And were you provided information as to the type of vehicle

23   you were looking for?

24   A.  Yes, sir.

25   Q.  And what was that vehicle, sir?

A.   It was a silver Toyota Avalon.

Q.   And as you were patrolling that day, did you come across

that vehicle?

A.   Yes, sir, I did as it was exiting I-20 westbound and

getting onto Robinson Road.

Q.   And when you saw the vehicle, did you see anything unusual

about the vehicle?

A.   Yes, sir.  It was -- had an improperly displayed tag, which

was a tinted tag cover over the license plate.

Q.   Is that a violation, sir?

A.   Yes, sir.  If it's dark enough that you can't see the tag,

yes, sir.

Q.   And did you conduct a stop on the vehicle?

A.   Yes, sir, I did.

Q.   And when you stopped the vehicle, did you -- how many

people did you see inside that vehicle?

A.   One subject.  One male subject.

Q.   And is that the same person in court here today?

A.   Yes, sir.  He's the defendant sitting at the table.

Q.   And where was he sitting when you got to the vehicle?

A.   Driver's side.

Q.   And when you approached the vehicle, did you ask for the

defendant's driver's license?

A.   When I first approached the vehicle, he was real aggressive

and wanted to know why I stopped him.  I advised why I stopped

him, asked him for his driver's license again.  He produced the

driver's license.  And he asked me again, *Now, why did you stop

me?*  And I told him again why I had stopped him.

Q.  What happened then?

A.  Because of the traffic, he had parked in the center turn

lane instead of pulling into the parking lot or the right side

of the road.  He parked in the center turn lane.

   While I was informing him the second go-around why I

stopped him, I could smell burnt marijuana emanating from

inside the vehicle.  His eyes appeared to be bloodshot and

glassy.  So I asked him, if he would, to pull over to the left

side of the roadway, which would be the left side of Robinson

Road, into a parking lot.  I was going to perform a field

sobriety test.

Q.  What happened then?

A.  At that time I had his driver's license in my right hand

looking at it, and he snatched the license out of my hand.  And

when he snatched the license out of my hand, I reached back in

with my left hand to get the license back from him.

   At that time he grabbed my left wrist and hit the gas on

the car, and we started going down the road.  It caused me to

lose my balance.  And I wound up grabbing the driver's door

with my left arm like this (indicating).  He was trying to

steer the car and he was trying to look over his right

shoulder --

1  Q.  A little bit slower.

2  A.  Okay.

3  Q.  Let me ask you this.  When he -- when he grabbed your

4  wrist -- can you show us how he grabbed your wrist?

5  A.  Yes, sir.  It was with his left hand.

6  Q.  How long did he hold on to your wrist?

7  A.  I'd say it was for about a second or two, just long enough

8  to get me off balance and for him to get going down the road.

9  Q.  And when he actually was holding on there to you, did he

10  take off at that point in time or did he -- was he stationary?

11  A.  No, sir.  He started taking off down the road, and I

12  managed to pull my service weapon out with my right-hand.  And

13  I raised it up and I pointed it at him and told him to stop the

14  car.

15      And at that time he started pleading for me not to shoot

16  him, and he slammed on the brakes.  And when he did, the

17  momentum carried me forward and I went sliding down the

18  highway.

19  Q.  Now, as he's holding on to you at the vehicle, are you

20  being pulled by that vehicle or what's happening to you at that

21  point in time?

22  A.  Yes, sir.  I was being pulled by the vehicle.

23  Q.  And how is that?

24  A.  Just basically just holding on to the car.  I couldn't come

25  off the car because of the speed that he was going, which I

1  would estimate to be about ten miles an hour.

2  Q.  And then what happened then?

3  A.  After he hit the brake and I went forward, I was sliding

4  down the road.  And I seen him trying to cross back through the

5  center lane into the left and right lane of Robinson Road where

6  he made contact with several vehicles trying to get around them

7  through the right lane.

8      We was close to the intersection of what used to be the

9  Metrocenter Drive.  There used to be a Mexican restaurant

10  called El Chico's right there.

11  Q.  Now, as he held on to you, did he drag you any way?

12  A.  Yes, sir.  I'd say approximately probably 20 feet before he

13  let go.  And like I said, the reason he let go was because he

14  was having to grab the steering wheel to try to get the car

15  back through the lanes to try to make his escape, if that's

16  what you want to call it.

17  Q.  So he was holding on to your left hand.  Is that correct?

18  A.  He's holding on to my left wrist with his left hand and

19  he's trying to drive at the same time.

20  Q.  Now, are you facing the back of the vehicle at that time or

21  the front of the vehicle?

22  A.  I'm facing -- yes, sir.  By that time I was facing the

23  driver's side and back towards the back end of the vehicle.

24  Q.  So you were going backwards then?

25  A.  Yes, sir, I was going backwards.

1  Q.  When you finally came loose, did you cause any injury to

2  yourself?

3  A.  Tore up a good pair of pants, wound up with some scrapes on

4  my knees and on my arm.

5  Q.  What type of surface were y'all riding at that time?  Was

6  that the asphalt drive -- I mean asphalt road or was that just

7  a dirt area or what was that?

8  A.  No, it was asphalt.

9  Q.  After you were no longer by the car and the car took off,

10  did you try to chase after the car also?

11  A.  Yes, sir.  I got back up and had to run a pretty good

12  distance to get back to my patrol car.

13  Q.  And were you able to get up with the vehicle at that point

14  in time?

15  A.  It -- I didn't catch up with the vehicle until later.  I

16  could keep up with the pursuit on my radio in my car.  And I

17  grew up in west Jackson.  So I knew the area that he was

18  heading to and I knew several roads that I could cut through to

19  try to catch up with the pursuit.

20      But he was moving so fast and blowing through so many

21  intersections and red lights, it was -- I wasn't going to do

22  that kind of driving and put them -- other people in danger

23  trying to catch up with something that -- as reckless as his

24  driving was to try to catch it.

25  Q.  Do you know whether or not -- you said he hit two vehicles

1    I think after he -- after you were I guess taken away from

2    the -- or he let you go or you got away from the vehicle?

3    A.  I would say it was a minimum of two vehicles that I

4    remember.  Like I said, I was sliding on my back when he shot

5    through the lanes.  And I distinctly remember him hitting at

6    least two.  I don't know how many he struck as he went through

7    that particular intersection.

8    Q.  Do you know whose vehicles those were?

9    A.  Sir?

10   Q.  Do you know whose vehicles those were, who they belonged

11   to?

12   A.  One of them belonged to the Mississippi Bureau of

13   Narcotics, if I'm not mistaken.

14   Q.  Did you ever -- later see that same vehicle that afternoon?

15   A.  Yes, sir.  Finally, I heard on the radio that they had

16   located the vehicle on Horton Avenue.  And I went to that

17   location to positively identify if that was the car.  And it

18   was setting in a carport on Horton Avenue.

19   Q.  Is that the same car that you saw that afternoon the

20   defendant driving?

21   A.  Yes, sir.

22   Q.  Did you see anybody take or remove anything from that

23   vehicle?

24   A.  No, sir, I didn't.  The onliest thing that I could observe

25   was a white powdery substance that was spilled out on the --

1  the inside of the car, onto the doorjamb and on -- which is the

2  rocker panel area of the lower door and on to the ground.

3  Q.  Did you look inside the vehicle?

4  A.  No, sir, I never looked inside the vehicle.

5        MR. RUSHING:  Tender the witness, Your Honor.

6        THE COURT:  Let me ask one question.  And then,

7  Mr. Hollomon, you can follow up on that.

8        MR. HOLLOMON:  Yes, sir.

9                        **EXAMINATION**

10 BY THE COURT:

11 Q.  Officer, when you first made the stop, was there any

12 visible damage to the front bumper, the front left quarter

13 panel or the -- I think the right rear quarter panel?

14 A.  None that I could see, Your Honor.

15 Q.  Any pieces of the vehicle that were -- that be had been --

16 that a had off, in other words, you could see exposed

17 underneath the quarter panels?

18 A.  No, sir, not that I recall, sir.

19 Q.  All right.  Thank you.

20        MR. HOLLOMON:  Thank you, Your Honor.

21        THE COURT:  Yes, sir.

22                    **CROSS-EXAMINATION**

23 BY MR. HOLLOMON:

24 Q.  Officer Townsend, my name is Joe Hollomon.  I represent

25 Marcus Shelby.  I've got a few questions I'd like to ask you

1    about this incident, if I may.  On this particular day, DEA

2    called you on the radio and asked you to effect a stop of this

3    vehicle.  Is that correct?

4    A.  I was contacted through my cell phone.

5    Q.  Cell phone.  I'm sorry.

6    A.  Yes, sir.

7    Q.  And what did they want you to do?

8    A.  They advised that they had a vehicle that they were

9    observing and that they would like for a traffic stop to be

10   initiated on it, if I could find a reason to initiate a traffic

11   stop on the vehicle.

12   Q.  Well, fact of the matter is, I mean, you were going stop

13   the vehicle because DEA asked you to stop the vehicle, weren't

14   you?  I mean, that's the truth of the matter.

15   A.  My protocol is to have a reason to stop a vehicle.

16   Q.  Well, what if you didn't have a reason to stop the vehicle?

17   Were you going to let the vehicle go?

18   A.  I have.

19   Q.  Well, is that what you were going to do on this occasion?

20   A.  Never got to that point.

21   Q.  Okay.  But when you stopped Mr. Shelby, he wanted to know

22   why you were stopping him, didn't he?

23   A.  That is correct.

24   Q.  I mean, that's why he seemed to be initially questioning of

25   what was going on, why he was pulled over.  He didn't know

1   about the call you had received from DEA.

2   A.   I guess he didn't.

3   Q.   Okay.  Now, you stopped him.  Then he went up -- you went

4   up to the car driven by Mr. Shelby and asked him for his

5   license.  Is that what happened?

6   A.   That is correct.

7   Q.   And he gave you his license.

8   A.   No, sir.  He demanded to know why I stopped him.

9   Q.   Okay.  I'm sorry.  And did you tell him why you stopped

10  him?

11  A.   Yes, sir.

12  Q.   And did you then ask for his license?

13  A.   License and insurance.

14  Q.   Okay.

15  A.   Again.

16  Q.   Did he produce those things?

17  A.   He didn't have the insurance, but he did have his driver's

18  license.

19  Q.   Okay.  And did the license appear to be valid?

20  A.   Yes, sir.

21  Q.   And, Officer Townsend, were you standing at the driver's

22  door of his vehicle, of this Toyota vehicle?

23  A.   That is correct.

24  Q.   And could you have unrestricted access into the vehicle?

25  I'm speaking in terms of your sight.

1    A.  Yes, sir.

2    Q.  Okay.  Did you see a weapon in the vehicle?  You're trained

3    for that, aren't you?

4    A.  I try to be observant, but there's areas in the car that I

5    can't see, under the seat, alongside the seat on his right

6    side --

7    Q.  I understand.  But you're trained --

8         MR. RUSHING:  Your Honor, he has a right to finish his

9    question -- his answer.

10        THE COURT:  Let him finish.

11        MR. HOLLOMON:  I'm sorry, Your Honor.

12   BY MR. HOLLOMON:

13   Q.  Go ahead, Officer Townsend.  I didn't mean to interrupt.

14   A.  No problem, sir.  I could see certain areas of the vehicle,

15   but not the whole accessible area that he had access to.

16   Q.  Well, his immediate wingspan or the area immediately

17   adjacent within arm's reach is what you're concerned with,

18   isn't it?

19   A.  Correct, or anything that he might be sitting on.

20   Q.  Absolutely.  Did you see anything in -- that he might grab,

21   a weapon or anything, as you stood there?

22   A.  No, sir.

23   Q.  Okay.  Now, at some point this escalated.  He grabbed his

24   license from your hand.  Right?

25   A.  Yes, sir.

1  Q.  And tell us what happened again there so I can get the

2  sequence down.

3  A.  When he grabbed the driver's license, that's when I told

4  him to give the driver's license back.  I had asked him to pull

5  into the parking lot.  I got to back up a little bit.  I asked

6  him to pull into the parking lot, and I still had his driver's

7  license in my hand.  And that's when he snatched the license

8  out of my hand.

9      And that's when I looked at him and said, *Give me those*

10 *back*.  And I reached in with my left hand to retrieve the

11 license back from him.  As aggressive as he was, I thought he

12 was just snatching the license out of my hand and was fixing to

13 pull into the parking lot.  And that's when I asked for the

14 license back, reached in to get them.  And that's when he

15 grabbed my left wrist and that's when he hit the gas on the

16 car.

17 Q.  How far in the car did you reach with your left hand?

18 A.  Probably about up to my elbow.

19 Q.  Oh, okay.  All right.  And how did he grab your left wrist?

20 A.  With his left hand.

21 Q.  All right.

22      MR. HOLLOMON:  Your Honor, may I approach the witness?

23      THE COURT:  Yes.

24 BY MR. HOLLOMON:

25 Q.  Can you demonstrate how, Officer Townsend, he grabbed your

```
1   left arm?

2   A.  (Indicating)

3   Q.  Like that?

4   A.  Yes, sir.

5   Q.  With his left arm.

6   A.  Yes, sir.

7   Q.  Okay.  And what happened after that?

8   A.  He hit the gas.

9   Q.  Let me ask you this.  As you demonstrated how he held your

10  left arm and you said just a minute ago he held it for just a

11  second or two.  Right?

12  A.  (Nods head affirmatively)

13  Q.  Could you have yanked -- I'm sorry.  You're going to have

14  to answer for the record.  You shook your head.

15  A.  Can you do --

16  Q.  You said just a minute ago under direct examination he held

17  your arm for just a second or two.

18  A.  About two seconds, two, three seconds, long enough to get

19  me off balance.

20  Q.  Okay.  Couldn't you have jerked your arm away from him?

21  A.  All depending on your momentum.  I'm going forward and he's

22  grabbing on.  The --

23  Q.  But in all honesty, you're fit.  You could -- you could

24  have yanked your arm away from him if you wanted to.

25  A.  If I had good footing, I might could have, but --
```

1    Q.  But in this case you didn't try.

2    A.  Didn't have much of a chance.

3    Q.  I understand.

4    A.  We're talking about seconds.

5    Q.  But I think you said the next thing you did was you grabbed

6    onto the vehicle.

7    A.  And when I lost my balance, my left arm was inside the car.

8    So I caught it with my arm over the -- draped over the --

9    through the driver's window.

10   Q.  Okay.  And is the car at this point going forward or in

11   reverse?

12   A.  Oh, it's going forward.  Yes, sir.

13   Q.  It's going forward.

14   A.  Yes, sir.

15   Q.  Okay.  All right.  Were you trying to run along with the

16   vehicle?

17   A.  I was trying to keep my feet from getting up underneath the

18   rear tire and getting sucked under the vehicle.

19   Q.  Yeah.  I understand.  And you said he was driving about ten

20   miles per hour.

21   A.  Estimate at that time, ten miles and picking up speed.

22   Q.  Okay.  And at this point you were fortunately able to

23   regain your balance.  You drew your service weapon, pointed it

24   at Mr. Shelby and ordered him to stop.

25   A.  Never regained my balance.  I was hanging on to the side of

1    the car door and pulled my weapon with my right hand.

2    Q.  Okay.  And you ordered him to stop.

3    A.  Yes, sir.

4    Q.  And that's what he did.

5    A.  He -- yes, sir.  He started trying to slow the car down,

6    started begging me not to shoot him.

7    Q.  Okay.  But he stopped.

8    A.  Somewhat, yes, sir.

9    Q.  Oh, I think in your report you say he stopped so suddenly

10   it threw you to the ground.

11   A.  No, sir.  What my report says basically and what I'm trying

12   to explain is when he went forward and I pulled my weapon, he

13   started slowing the vehicle down and he did almost come to a

14   complete stop.  I didn't say it was a dead stop.  And then

15   that's -- when I came off the vehicle is when he finally

16   stopped the vehicle harder to get it to stop after I pulled my

17   weapon.

18   Q.  Okay.  Did you do a report after this?

19   A.  Yes, sir.

20   Q.  And in that report did you say that the driver looked at

21   Trooper E. David Townsend after you pointed the weapon at him

22   and said, "Please, don't shoot me" and slammed on the vehicle's

23   brakes?

24   A.  Yes, sir, basically.  He started braking the car.

25   Q.  Okay.

A.   We started decelerating a lot faster.

Q.   Okay.  So he stopped pretty quickly.  He did what you told
him to do.

A.   Yes, sir.

Q.   Okay.  Now, it's pretty clear he was trying to get away
from you, wasn't he?

A.   I guess you could say that.  Yes, sir.

Q.   Well, you've got a lot of experience in 22 years.  Did you
think*, This guy has got something in the car.  He's -- DEA is
calling me.  He's trying to get away from me*?

A.   Sir, I've had some people run for some stupid reasons.  So
I really can't say.

Q.   Yeah.  But it was to you -- the one thing that was clear to
you, he was trying to get away.

A.   Yes, sir.

Q.   Okay.  Do you have any particular reason to believe he
specifically wanted to do you harm?

A.   By his actions, yes, sir.

Q.   Okay.  All this happened very quickly, didn't it?

A.   Yes, sir.

Q.   Okay.  Did it actually -- it threw you to the ground,
officer, did it not?

A.   Yes, sir.

Q.   And, fortunately, did not hurt you in any serious way.
I'm -- is that correct?

1    A.   Correct.   No broke bones.

2    Q.   Thank goodness.   And it's apparent if he wanted to

3    seriously injure you, he could have run over you with the car,

4    couldn't he, after you were there on the ground?

5    A.   His vehicle was going a different angle from the direction

6    that I went -- came off the vehicle.

7    Q.   Okay.

8    A.   And at that point I was also worried about getting run over

9    by the oncoming traffic that was coming at me at the particular

10   time.

11   Q.   Okay.   But if he were really wanting to do you harm, he

12   could have tried that.

13   A.   That's a question you'd have to ask him, sir.

14   Q.   Well, you were there.

15   A.   Yes, sir.   But I don't know what his intentions -- exact

16   intentions was going to be once I was on the ground.

17   Q.   Well, he took off, didn't he?

18   A.   Yes.

19   Q.   Okay.   And this whole thing about holding your wrist I

20   think you said took a -- he held onto you a second or two?

21   A.   About two -- yes, sir, I'd say about two, three seconds.

22   It was just long enough to get me off balance.

23   Q.   Okay.   And I think you said this extended about 20 feet

24   before he stopped.

25   A.   Yes, sir.   I'd say maybe a little more.   I never measured

1   the exact distance.

2   Q.  Okay.  All right.  And then you were able to get back in

3   your vehicle and pursue him.  Right?

4   A.  Yes, sir.

5   Q.  Okay.

6   A.  Keep up with the pursuit, not pursue him.  I just monitored

7   the pursuit on the radio and started trying to see if I could

8   intersect with them to fall in behind them.

9   Q.  Okay.

10          MR. HOLLOMON:  Your Honor, may I have one second?

11      (COUNSEL AND DEFENDANT CONFERRED)

12  BY MR. HOLLOMON:

13  Q.  Now, let me ask you this, Officer Townsend.  You had a dash

14  cam in your car, didn't you?

15  A.  Yes, sir.

16  Q.  Was that dash cam pointed so as to record this stop?

17  A.  No, sir, because I had a windshield replaced in the car I

18  believe it was a couple of days before, and they failed to

19  tighten the camera up on the car.  So the camera wasn't angled

20  exactly towards the front end of the car, which I didn't

21  realize that until after I downloaded the -- or tried --

22  attempted to download the video.

23  Q.  And you've seen the video.  Right?

24  A.  Sir?

25  Q.  You've seen the video, have you not?

1    A.   There's no video really to see --

2    Q.   That's what I was going to say.  I've seen it too and it

3    doesn't show any of this, does it?

4    A.   No, sir.

5    Q.   Does it normally pick up audio?

6    A.   We don't have the world's greatest audio system on those

7    cameras, but it does pick up some audio.

8    Q.   Okay.  On this occasion did it pick up any audio?

9    A.   I don't -- I believe it did, but it's not very audible.

10   It's not very -- you can't really hear everything going on.

11   Q.   Okay.  It's not really of any value, is it, evidentiary

12   value?

13   A.   I really would have to watch it again.  I haven't watched

14   the video -- I just downloaded the video and might have watched

15   it one time.  So I'd have to go back and revisit it to see if

16   there was anything.

17   Q.   Well, you would agree it doesn't show any of this.  It's

18   pointed --

19   A.   That's correct.

20   Q.   -- in another direction?

21   A.   That is correct, sir.

22          MR. HOLLOMON:  That's all I have, Your Honor.

23          THE COURT:  Redirect?

24          MR. RUSHING:  No, Your Honor.

25          THE COURT:  Thank you, officer.  You can step down.

1    MR. RUSHING:  Call Kevin Dear, Your Honor.

2    **KEVIN DEAR,**

3    having first been duly sworn, testified as follows:

4    **DIRECT EXAMINATION**

5    BY MR. RUSHING:

6    Q.  Would you state your name, please, sir.

7    A.  Kevin Dear.

8    Q.  And, Mr. Dear, where are you employed, sir?

9    A.  The Mississippi Bureau of Narcotics.

10   Q.  And for how long there, sir?

11   A.  Almost four years.

12   Q.  And what do you do with the bureau of narcotics?

13   A.  I work narcotic investigations in the state of Mississippi.

14   Q.  Back in October of 2015, were you involved in the

15   investigation against individuals here in the Jackson area for

16   the sale and distribution of cocaine?

17   A.  I was.

18   Q.  And was one of those individuals by the name of Marcus

19   Shelby?

20   A.  Yes.

21   Q.  And had you known Mr. Shelby before that occasion?

22   A.  Not personally, but I'd heard his name on the streets of

23   Jackson.

24   Q.  I believe October 25th, 2015, were you involved in the --

25   when Mr. Shelby was actually stopped by Officer Townsend?

1    A.  Yes, I was.

2    Q.  And if you would, where were you whenever this stop

3    actually occurred?

4    A.  I was on Robinson Road across the street observing as

5    Trooper Townsend made this traffic stop.

6    Q.  Now, whenever you're observing there, did you observe

7    whenever the car first pulled off the side of the road?  Or

8    what part did you actually observe Mr. Townsend with that

9    vehicle?

10   A.  I observed Trooper Townsend blue light the vehicle and as

11   both vehicles came to a stop, the suspect's vehicle as well as

12   Trooper Townsend's.  And I observed Trooper Townsend as he

13   walked up to the driver's side window of the suspect's vehicle.

14   Q.  What kind of vehicle was that?  Do you recall?

15   A.  It was a silver Avalon maybe.

16   Q.  And when you saw that vehicle there at that time, did

17   you -- did the vehicle appear to be damaged in any way?

18   A.  It did not.

19   Q.  And what did you see?

20   A.  I observed Trooper Townsend make contact with the driver of

21   the vehicle, just a short period of time of a conversation.  I

22   saw Trooper Townsend being drug down Robinson Road, at which

23   time I keyed up on the radio and told everybody that he's

24   dragging Elmo, which is Elmo Townsend.

25        At that particular time I activated my blue lights and

1    sirens.  And I pulled on to Robinson Road, pulling in front of

2    the suspect's vehicle.  At this time I was still observing Elmo

3    being drug.

4        I also observed Elmo pull his pistol during this -- as he

5    was being drug, with his right hand.  As I pulled in front of

6    the suspect's vehicle, the suspect's vehicle hit the front

7    passenger fender of my vehicle.  Then he accelerated, pushing

8    me out the way, and fled the scene in his vehicle.

9    Q.  When you said he pushed your vehicle, what part of his

10   vehicle was pushing your vehicle?

11   A.  The front part of his vehicle hit the front passenger side

12   of my vehicle.

13   Q.  I want to show you Exhibit Number 9.  And can you tell

14   us -- can you see that vehicle there, sir?

15   A.  I do.

16   Q.  And can you tell us whether or not you've seen that

17   photograph before?

18   A.  I've seen the photograph earlier.

19   Q.  And what is that, sir?

20   A.  That's the suspect's vehicle.

21   Q.  And does it show damage to the driver's front side of the

22   vehicle?

23   A.  I do see damage to the front driver's side of the vehicle.

24   Q.  After he accelerated and pushed your vehicle out of the

25   way, what did he do?

A.  He fled the scene at a very high rate of speed.  He was on

Robinson Road.  We proceeded behind him with activated blue

lights and sirens.  He turned -- he made a right on to Highway

80, proceeded to Ellis Avenue.  Took Ellis Avenue to -- to

Woodrow Wilson and made a right.  And that's where I lost sight

of him.

    He had gained so much speed ahead of me.  He was blowing

through intersections.  It was heavy traffic and it had been

raining.  And we were concerned.  We didn't want to cause an

accident.  He just drove off and left me.

Q.  Did you see him run any red lights or do any improper

passing of other vehicles?

A.  Yeah.  When he was coming up to -- on Highway 80 to Ellis

Avenue intersection, he blew through the red light.  At that

time that was an extremely busy intersection.  There were

vehicles attempting to come through the intersection that had

green lights and went over, slammed on brakes.  And we slowed

down the best we could out of concern to safely proceed behind

him.

Q.  At what point did you lose the defendant?

A.  When he was on Ellis Avenue and he made a right on Woodrow,

I had lost sight of him at that point.

Q.  Were you involved in the investigation to try to locate the

vehicle later on that day?

A.  Yes.  We all canvased the area.

1    Q.  Were any other officers working with you trying to find

2    that vehicle?

3    A.  Yes.  Task Force Officer John Johnson, he was able to stay

4    with the vehicle.  And he proceeded behind the vehicle and

5    ultimately observed the vehicle drive over a ditch or over a

6    walkway which led into a park.  And Johnson was unable to

7    proceed behind him due to the fact that he had kind of drove

8    through this walkway.  The vehicle was last seen per Johnson

9    going through a park.

10   Q.  Did you later see a picture of that particular I guess

11   walkway that he ran through?

12   A.  Yes, I did.

13   Q.  And is that -- what kind of park was that?

14   A.  It used to be a park people would go to in the community

15   to -- I can't advise the name of the park.

16   Q.  Now, that particular day, though, it was raining.  Is that

17   correct?

18   A.  Correct.

19   Q.  Do you know whether or not anybody was inside the park that

20   day?

21   A.  I don't know if anybody was in the park.

22   Q.  Do you know whenever the vehicle I guess went into that

23   particular park whether any damage was done to his vehicle?

24   A.  I saw the vehicle after it had gone through the park, and

25   there was damage to the vehicle at that time.

1   Q.  Now, when you first saw that vehicle that day, was that

2   damage to the vehicle there?

3   A.  No.

4   Q.  So it had occurred sometime during the chase.  Is that

5   correct?

6   A.  Correct.

7          MR. RUSHING:  Tender the witness, Your Honor.

8                        **CROSS-EXAMINATION**

9   BY MR. HOLLOMON:

10  Q.  Good afternoon, Agent Dear.  My name is Joe Hollomon.  I

11  represent Marcus Shelby.  Did you -- were you present when the

12  vehicle was located later that afternoon?

13  A.  Yes, I was.

14  Q.  And did you play any role in inventorying the vehicle or

15  doing anything inside the vehicle?

16  A.  I don't recall doing anything inside the vehicle.  I

17  remember walking around the vehicle and assisting on clearing

18  the residence at that location for officer's safety.

19  Q.  Did you see anything in the vehicle that caught your

20  attention?

21  A.  I did not go inside the vehicle.  I walked around it

22  looking through the window.

23  Q.  Did you see anything that caught your attention?

24  A.  Not that caught my attention.

25  Q.  Okay.  Did you yourself see this vehicle go through this

1  park?

2  A.  I did not.

3  Q.  Okay.  Did you come along, Agent Dear, later and look at

4  the park to see if there were any tracks or anything?

5  A.  I came to the walkway where the vehicle actually drove

6  through or over the ditch, however you want to look at it,

7  entering the park.  I observed that.  I did not walk through

8  the park.

9  Q.  Okay.  Were there ruts through the park?

10  A.  I did not walk through the park.

11  Q.  Did you see any, observe any?

12  A.  Not from the side of the ditch that I was on.

13  Q.  Okay.  All right.  And when you were there, did you see any

14  individuals or people in the park?

15  A.  I did not.

16          MR. HOLLOMON:  That's all I have, Your Honor.

17          THE COURT:  All right.  Any redirect?

18          MR. RUSHING:  No, Your Honor.

19          THE COURT:  All right.  Thank you.  You can step down.

20          MR. RUSHING:  That's all we have, Your Honor.

21          THE COURT:  Okay.  All right.  Mr. Hollomon, do you

22  have any evidence you wish to put on?

23          MR. HOLLOMON:  Your Honor, not with respect to

24  objections.  I think we do have witnesses -- we have none to

25  call with respect to these objections, Your Honor.  We do have

 1    a couple of character witnesses we'd like to call.  And, of

 2    course, my client would like to make a statement of allocution.

 3                THE COURT:  Of course.  Okay.  In that case,

 4    Mr. Hollomon, why don't you come up and we'll take up the legal

 5    issues.

 6                MR. HOLLOMON:  Yes, sir.

 7                THE COURT:  All right.  So the first objection would

 8    be the firearm enhancement under 2D1.1(b)(1).

 9                MR. HOLLOMON:  Yes, Your Honor.  We submit that based

10    on the evidence, two individuals, including the officer who

11    stopped him at the time and had unrestricted visual access to

12    the vehicle, did not see a handgun in the car.  So I think it's

13    fair to say my client could have gotten in the car, driven it.

14                And we make no issue of the fact that he had driven

15    the car in the past.  I think that's -- he readily admits that.

16    But there's nothing to show he knew there was a gun in the car

17    on this occasion or that it had anything to do with the

18    commission of this offense.

19                And two witnesses, Agent Dear and Officer Townsend,

20    saw the vehicle at the time.  Their sworn testimony is they saw

21    nothing in the car.

22                THE COURT:  All right.

23                MR. HOLLOMON:  We submit the government has not met

24    their burden in establishing that.

25                THE COURT:  Let me just, if I could, sort of narrow

1    the issues a little bit.  I understand the argument you just

2    made.  Initially, you made an argument this wasn't his car, but

3    it seems -- seems that he was at least in possession of this

4    car for a good period of time and that his personal things,

5    including his wedding invitation, were inside it and it's the

6    car he was stopped in.  So I take it that's not part of the

7    argument at this point?

8         MR. HOLLOMON:  Well,Your Honor, in truth and fact, it

9    was not his car.  But, no, we're relying on the testimony

10   before the court regarding -- there's simply nothing to

11   establish his knowledge of the weapon in the car on this

12   occasion.

13        THE COURT:  All right.  The other sort of legal

14   question is, assuming for the sake of argument that he was

15   aware of the firearm in the vehicle, the sort of legal

16   framework for these issues is whether or not, you know, the

17   firearm was in temporal and spatial relationship to the crime.

18   I take it that that's not an issue that you're contesting.

19   You're contesting whether he knew the gun was in there at all.

20        MR. HOLLOMON:  Yes, Your Honor.

21        THE COURT:  Is that a fair --

22        MR. HOLLOMON:  That's exactly what we're saying.

23        THE COURT:  All right.  Mr. Rushing.

24        MR. RUSHING:  Your Honor, I think we were able to show

25   that he had been in possession of the vehicle for some time

1    there, at least from September of 2015 up until October of

2    2015.  And it's fair to -- fair to believe that he had access

3    to the vehicle the entire period of time and that he knew the

4    firearm was in there.

5         The photograph that was shown to the court today shows

6    the firearm stuck in between the driver's seat and the console

7    there.  It's such a particular area, Your Honor, that not a lot

8    of gun was showing up.  So I understand why the police officers

9    may not have seen it at the time they stopped him, because his

10   body could have been hiding that part of the gun, Your Honor.

11        But within -- within the hour after he was stopped

12   they found that car, Your Honor, and they found the gun inside

13   that car in that particular area.  I think the evidence

14   substantiates the fact that he was, in fact, in possession of

15   that firearm, Your Honor.  I think we've proven the spatial and

16   also the temporal existence between the firearm, the drug

17   activity at that time period and the defendant.

18        THE COURT:  Okay.  All right.  Thank you.  Give me

19   just a minute.

20        (PAUSE)

21        THE COURT:  All right.  The objection is overruled.

22   The standard that applies here is a preponderance standard.  As

23   we've noted under *U.S. v. Salado*, S-A-L-A-D-O, Fifth Circuit,

24   2003, the government must prove by a preponderance of the

25   evidence that a temporal and spatial relation existed between

1    the weapon and the drug trafficking activity and the defendant.

2          The defendant in this case does not contest that those

3    relationships would exist if there's -- if he had knowledge

4    that the gun was in the car at the time.  With respect to that,

5    it does appear to me that whether he owned the car or whether

6    the car was titled in his name is really not probative of the

7    main issue because he was in possession of the car for a fairly

8    substantial period of time based on the record in front of me.

9          There's evidence, photographic evidence, wiretap

10   evidence, surveillance evidence, that the defendant asked

11   Charlie Martin on September 4th to tow his vehicle, which was a

12   silver Avalon.  The recorded conversations on October 24th

13   indicate that the defendant was to go to Nunez's house to pick

14   up narcotics.  The defendant arrived and was seen in the silver

15   Avalon.

16         The defendant was stopped in the silver Avalon.

17   Within the silver Avalon there were a number of items found,

18   including a wedding invitation with his name on it, all

19   indications that he had been operating this vehicle as his own.

20         With respect to whether the butt of a handgun was

21   visible, the photograph that was admitted into evidence shows a

22   butt of a gun sticking up between the driver's seat and the

23   console.

24         Mr. Rushing, would you put that back on the screen for

25   just a minute.

1        MR. RUSHING:  Yes, Your Honor.

2      (COMPLIED WITH REQUEST)

3        THE COURT:  The gun itself is just slightly in front

4    of the receptor for the seat belt, maybe two inches.  It's not

5    surprising to me that Officer Townsend would not have been able

6    to see the gun in that position when the defendant was sitting

7    in the car.  It's pretty clear to me it would have been

8    obscured.  Plus there were other things I think that Officer

9    Townsend was probably more worried about in that confrontation.

10   Officer Dear indicated he didn't search the car but looked

11   through the windows and didn't see anything.

12       On the other hand, the PSR indicates that the car was

13   secured and that it was taken for inventory.  The forensic

14   scientist testified that the car -- the conditions of the car

15   and how it was kept before her arrival and took the photograph

16   that we have here.

17       Finding that the gun was there, it's impossible to

18   believe that anybody driving the car wouldn't know that it was

19   sitting there right next to the seat belt.  The objection is

20   overruled.

21       All right.  The next objection is under 3A1.2(c)(1),

22   Mr. Hollomon?

23       MR. HOLLOMON:  It is, Your Honor, yes.  Judge, I

24   want -- the court is familiar with what -- our submission on

25   this issue.  And we simply state that the evidence before the

1  court this afternoon from Officer Townsend himself does not

2  establish that my client had specific intent to cause him

3  injury.

4          He was trying to get away.  He knew what was in the

5  car.  He knew it was illegal.  It could subject him to a

6  lengthy prison sentence, and he did not want to be caught with

7  it.  He wasn't trying to harm specifically -- did not have

8  specific intent to try to harm Officer Townsend.  I think if he

9  intended to do that, he had every opportunity to do it after

10 Officer Townsend was thrown to the pavement, and he could have

11 done it.  Instead of doing that, he took off as fast as he

12 could, trying to get away and avoid detection of what he knew

13 was in the vehicle.

14         THE COURT:  The legal issue, of course, is whether I

15 even have to make a finding on intent and, if so, what that

16 intent finding is.  I think all three of us essentially found

17 the same -- same law.  But assuming that there is an obligation

18 on my part to find intent, wouldn't I have to find that -- not

19 that he had the intent to injure the victim, but that the

20 defendant intended the assault?

21         MR. HOLLOMON:  Yes, Your Honor.  I think that's the --

22 at the very least, that is the finding that the court would

23 have to make.  We would argue under *U.S. v. Taylor*, specific

24 intent has to be shown under 18 U.S.C. 111(a)(1).

25         THE COURT:  *Taylor* is the -- is that the case

1    involving the jury instructions on temporary insanity?

2         MR. HOLLOMON:  Yes, Your Honor.

3         THE COURT:  And I read the case because you cited it,

4    but it seemed to me that that was at best dicta on this point.

5         MR. HOLLOMON:  Yeah, I agree with the court.  It does

6    seem to be, but it's not -- it's still good law.  I Sheparded,

7    and it has not been overturned or any ruling made by the Fifth

8    Circuit that in any way contradicts it.

9         THE COURT:  Okay.  All right.  Mr. Rushing.

10        MR. RUSHING:  And, of course, I believe you don't have

11   to find specific intent at all.  I think I saw the Eighth

12   Circuit court case that talks about the -- the *Coleman*.  But

13   that's the only case I could find that talked about a

14   particular instance, Your Honor, concerning intent itself.  But

15   I don't think you have to show intent.

16        If you set -- if he intended to set forth the acts he

17   did by grabbing the officer and driving off, I think that's

18   sufficient to show a serious substantial risk of injury to that

19   particular person, Your Honor, knowing he's a law enforcement

20   officer under *Coleman*.

21        THE COURT:  All right.  Any rebuttal?

22        MR. HOLLOMON:  No, Your Honor.

23        THE COURT:  All right.  Guideline Section 3A1.2(c)(1)

24   includes an enhancement if the defendant created a substantial

25   risk of serious bodily injury.  "If, in a manner creating a

1  substantial risk of serious bodily injury, the defendant or a

2  person for whose conduct the defendant is otherwise

3  accountable, knowing or having reasonable cause to believe that

4  a person was a law enforcement officer, assaulted such officer

5  during the course of the offense or immediate flight

6  therefrom."

7         Let me just quickly say, because it's not disputed, I

8  don't think there's any dispute that he would -- that he knew

9  that it was a law enforcement officer or had reasonable cause

10 to believe that Officer Townsend was in law enforcement.

11        The third element is also satisfied because it

12 occurred during the offense or immediate flight therefrom.

13 Application note 4 states, "Subsection C applies in

14 circumstances tantamount to aggravated assault against a law

15 enforcement committed in the course or in immediate flight

16 following another offense."

17        Substantial risk of serious bodily injury is defined

18 to include any more serious injury that was risked as well as

19 actual serious bodily injury or more serious injury if it

20 occurs.  In other words, it doesn't have to be an actual injury

21 here as long as it's a serious injury that's risked.  And I

22 think that anytime somebody's dragged by a car there is a

23 serious risk of injury there.

24        So the question that Mr. Hollomon appropriately

25 focuses on is whether there was intent.

1          Again, *United States v. Corea-Rodriguez* -- that's 632

2    Fed. Appx 776, Fifth Circuit, 2015 -- the court stated, "This

3    court has not explicitly held that the district court is

4    required to make a finding of specific intent in order to apply

5    an enhancement under Section 3A1.2(c)(1)."

6          In *United States v. Garcia*, the Fifth Circuit stated

7    in citing *United States v. Moore* that under 18 U.S.C. Section

8    11(a)(1), assault of a federal employee, quote, the defendant

9    does not need to have the intent to injure the victim, but the

10   government must show that the defendant intended the assault,

11   close quote.

12         I find in this case that the defendant did have that

13   level of intent as he grabbed on to the officer and held him

14   for a period of time.  That, of course, is assuming that I even

15   have to find or make a ruling based on intent.  All right.

16         The next objection is 3A1.3 which applies if the

17   defendant physically restrains a victim in the course of the

18   offense.  If so, there would be a two-level increase.

19   Mr. Hollomon.

20         MR. HOLLOMON:  Your Honor, there are extensive --

21   there's extensive case law regarding this and what constitutes

22   restraint beyond what is cited in the guidelines application

23   note of being bound or tied in some fashion.  But all of those

24   involve a use of force or threatened force as well as some type

25   of restraint.

         Here the testimony is that Officer Townsend's left
wrist was grabbed for he initially said a second or two and he
changed it later to a couple of seconds, two or three seconds.
At any rate, I think it's indisputable it was a very short
period of time.  He seemed to indicate and agree with me that
he could have jerked his arm away and unrestrained himself if
he had chosen to do so.

         I simply think, Your Honor, based on this record, that
because of the very short duration, the fact that he could have
jerked his arm away from the defendant and the fact that I
really don't think it's possible for him to simply hold on to
his wrist as the officer demonstrated and drag him for -- a man
of his size for any significant distance.  He said 20 feet
maximum, the car going ten miles per hour maximum.  I simply
urge the court here that this is not a restraint as
contemplated by the guidelines.

         THE COURT:  Well, just --

         MR. HOLLOMON:  It's touching.

         THE COURT:  Well, as a factual matter, I'm having a
hard time believing that Officer Townsend wanted to be dragged
by the car.  I mean, I have a feeling that if he -- that he was
trying to get away and ultimately did.  I can't imagine that
that's something he signed up and wanted to do.

         MR. HOLLOMON:  Oh, I don't think he did, Your Honor.
I'm not arguing that in any way.  I think he's without fault as

far as that goes.  But I think he -- he did want to I think --

his training kicked in.  He did not want to let Shelby get

away.  I think he wanted to stop him, and I think his instinct

kicked in.

But I don't think it was the restraint by my client's

touching him for a couple of seconds on the left arm that

restrained him in any significant way.  I think he could have

jerked his arm away if he had so chosen.  And, in fact, he had

enough dexterity to pull his service revolver and point it at

my client.

At some point -- I think immediately -- if he had just

held on to him for a second or two, Your Honor, then he said he

grabbed on to the car.  I think it's clear what he was trying

to do was prevent the defendant from leaving.  He had stopped

this guy.  His training kicked in.  He didn't want him to

leave.  But I don't think it was my client's touching him on

the left wrist for two seconds that constitutes restraint and

should give him a two-point increase under the guidelines.

THE COURT:  Okay.

MR. HOLLOMON:  Thank you, Your Honor.

MR. RUSHING:  Your Honor, the problem is that the

defendant on this occasion actually grabbed ahold of the

officer's wrist, not just grabbing ahold for a few seconds, but

grabbing the wrist and accelerating the car and then throwing

the officer off balance at that point in time, Your Honor.

```
 1              Of course, there's a number of cases that talk about
 2    how long the restraint doesn't have to be.  Froppe (sic), U.S.
 3    v. Froppe is one of those I believe that --
 4              THE COURT REPORTER:  What is the name?
 5              MR. RUSHING:  Froppe I believe.  I'm sure I'm
 6    pronouncing it the wrong way.  F-R-O-P-P-E is that case.
 7              There's also U.S. v. Plenty talks about the restraint
 8    also, Your Honor.
 9              But I think under the situation involved in this
10    particular case and the facts of the case, whenever the
11    defendant grabbed Mr. Townsend by the wrist, accelerated the
12    car, throwing the officer off balance, I think that that
13    enhancement should apply.
14              Of course, Froppe or Foppe, ever how you pronounce it,
15    Your Honor, that case also said it doesn't really matter how
16    long the actual grabbing or restraint lasted.  It can be short
17    term or long term.  And, of course, it talked about someone
18    being grabbed in the particular case there not for a very long
19    period of time also, Your Honor.
20              THE COURT:  All right.  This, to me, is -- it is a
21    close call.  Foppe, F-O-P-P-E, is the Ninth Circuit case you're
22    referring to.  And it indicates that the guidelines and the
23    application notes don't have a durational description.  And I
24    think in general terms I would agree with that.  But a
25    restraint of one to two second starts to spill over into --
```

1    this is not a matter of how long the restraint is; it's a

2    question of whether or not there was an actual restraint.

3            I'm going to grant the objection.  I do want to take

4    pause for a second to say that, you know, fortunately, Officer

5    Townsend, you know, in his -- first of all, fortunately, he

6    didn't get hurt.  But, second of all, it's fortunate that he

7    didn't pull the trigger.  We've all seen so many cases in the

8    last few years where situations a lot like this one where the

9    officer in a stressful situation pulled the trigger.

10           And in any event, I want to put on the record that

11   it's commendable that he was able to control the situation to

12   the extent where he didn't pull the trigger, because we'd be

13   looking at a much sadder result if he had.

14           You know, having said that, you know, the Fifth

15   Circuit, obviously, like every other circuit, has said that the

16   examples of restraint that are listed in the guidelines are

17   just examples.  And it is possible that physically holding

18   somebody victim would constitute confinement.

19           But the Fifth Circuit in *United States v. Hickman* said

20   that that would be coupled with a threat of violence.  And I'm

21   just not convinced that given the second or two that this

22   occurred that that would trigger an enhancement for the

23   restraint.  So I'm going to grant that one.  It's a close call,

24   obviously.  All right.

25           The next one is whether the defendant recklessly

1    created a substantial risk of death or serious bodily injury to

2    another person in the course of fleeing.  That's under Section

3    I believe 3C1.2, Mr. Hollomon?

4            MR. HOLLOMON:  It is, Your Honor.  Yes.  And, Your

5    Honor, here our biggest concern is that application note 1 to

6    this Section 3C1.2 advises "Do not apply this enhancement where

7    the offense guideline in chapter two or another adjustment in

8    chapter three results in an equivalent or greater increase in

9    offense level solely on the basis of the same conduct."

10           And, of course, we have the -- now have the court's

11   rulings with regard to the enhancement for six levels.  We

12   think, Judge, this is piling on.  It's double counting.  And it

13   essentially is the same conduct.  He -- he took off trying to

14   get away from the police with this cocaine.  And it didn't stop

15   and go through a variety of different iterations.

16           After he took off from Officer Townsend, he continued

17   until he got away from him and then stopped and abandoned the

18   car.  And we think it is all one course of conduct and should

19   be viewed that way, and he shouldn't be dinged again, so to

20   speak, for essentially the same conduct.

21           THE COURT:  All right.  Let me ask you, the

22   application note number 1 indicates, as you said, that there

23   shouldn't be double counting.  But that is only when the

24   offense level is, quote, solely on the basis of the same

25   conduct.  And, you know, there are a lot of cases out there

 1    that say if the chase continues and he acts recklessly after

 2    that or endangers people after that, that that's not solely

 3    based on the same conduct.

 4         The six-level increase has to do with endangering

 5    Officer Townsend.  But the undisputed testimony is that he ran

 6    into at least two other cars, went through stoplights, drove

 7    through a park.  So how is it solely based on what happened

 8    with Officer Townsend?

 9         MR. HOLLOMON:  Well, Judge, we think indisputably the

10    facts are what the facts are.  However, temporally, I mean, it

11    all occurred in one ongoing transaction.  There was no

12    stopping, no time for my client to gather his thoughts and

13    change his mind.  It happened all in one course of conduct

14    trying to get away from police to avoid detection of this

15    cocaine that was in the vehicle and he knew it.

16         So we think it was all part of one course of conduct

17    that, unfortunately, did lead into these other areas.  But it

18    all happened within a short period of time and without any

19    period of contemplation by my client to think about his conduct

20    and do something differently.

21         THE COURT:  Okay.  Mr. Rushing.

22         MR. RUSHING:  Your Honor, of course, I don't believe

23    it's the same course of -- same occurrence of conduct, Your

24    Honor.  At the time that Officer Townsend was actually

25    assaulted, that's separate from the other incidents where he

leaves the scene, runs into another police officer's vehicle
and pushes him out of the way and then goes on a number of
miles chase with police officers, running red lights and
passing on the wrong side of the road, things like that,
endangering other people of the community.

I think those are all separate, Your Honor.  And I
believe that this falls quite a bit in line to the *Gillyard*
case which says, you know, the police officer -- assaulting a
police officer and subsequent chase thereafter endangering
other people were two separate occurrences.  So I think the
enhancement does apply, Your Honor.

THE COURT:  Okay.  All right, Mr. Hollomon.

MR. HOLLOMON:  That's all we have, Your Honor.

THE COURT:  All right.  That objection is overruled.
As I mentioned before, the application note says that the
conduct must be solely based on the same conduct.  The *Gillyard*
case that Mr. Rushing mentions, which is also discussed in
*United States v. Benitez-Torres* from 2003, indicates that when
you have a chase like this, the court looks at the temporal and
spatial distinctiveness or separateness of the acts to
determine whether the conduct involves more than one culpable
act.

The enhancement that I applied with respect to
dragging Officer Townsend is based on that act.  But after that
act there's conduct that's reflected in paragraphs 20 and 21 of

1  the presentence report involving the subsequent flight where he

2  struck I believe it was Agent Dear's MBN vehicle.

3         He traveled at a high rate of speed going through

4  stoplights, through a park, driving at a speed at which the

5  officers didn't feel safe, and they stopped chasing him.  So

6  that's different conduct at a different time and that

7  application note and Section 3C1.2 apply.

8         Mr. Hollomon, you also had a -- I guess a legal

9  argument in there that the allegations were based on his

10 proffer.

11        MR. HOLLOMON:  Your Honor, we're not going to pursue

12 that argument.  I think I'm -- I'm satisfied that after further

13 examination that they developed otherwise.

14        THE COURT:  Okay.  And I agree.  That's obviously

15 correct.  All right.  Paragraph 51, the defendant objects to

16 one criminal history point for a conviction that was reported

17 for November 2016.  My understanding is that the probation

18 office and the government have conceded that objection.

19        MR. RUSHING:  That's correct, Your Honor.

20        THE COURT:  The point that's subtracted, though,

21 doesn't change the criminal history category is my

22 understanding.  Is that right?

23        MR. RUSHING:  That's correct, Your Honor.

24        MR. HOLLOMON:  I think that's correct, Your Honor.

25        THE COURT:  Okay.  There was also an objection to

1   paragraph 54 and -- in the original presentence report, and

2   that objection was addressed and I think corrections were made.

3           Mr. Hollomon, you may not have anticipated this

4   question; but in the defendant's letter to me he indicates that

5   he would be eligible for a safety value reduction.  There's no

6   formal objection made there, but he -- in his letter he said

7   that he thought he was entitled to that and asked me to look

8   into it.

9           I guess my understanding of how the safety value works

10  is that if the guideline's below the mandatory minimum, then it

11  might apply; but in this case the guideline range is above the

12  mandatory minimum.  In any event, he wouldn't satisfy the first

13  or second elements of the safety value because he has more than

14  one criminal history point and also because there was a firearm

15  involved.

16          MR. HOLLOMON:  And the cooperation issue, Your Honor.

17  And I -- for the record, Judge, I have gone over that with my

18  client, why that would, in my opinion, not apply in this case.

19          THE COURT:  Okay.

20          PROBATION OFFICER:  Your Honor, may I approach?

21          THE COURT:  You may.

22     (THE COURT AND PROBATION OFFICER CONFERRED)

23          THE COURT:  Counsel, let me make sure.  He has a

24  criminal history category of III.  He had an offense level of

25  35 for a range of 210 to 262 months.  I granted the objection,

two levels.  That would take him to a 33.  He remains at a

criminal history category of III for a guideline range of 168

to 210 months.

MR. RUSHING:  Yes, sir.

THE COURT:  Do the parties agree with that --

MR. RUSHING:  Yes, sir.

THE COURT:  -- in light of the court's rulings?

MR. RUSHING:  Yes, Your Honor.

MR. HOLLOMON:  Yes, Your Honor.

THE COURT:  And, of course, this offense carries a

mandatory minimum of not less than five years and a maximum

sentence of 40 years.  The court adopts the presentence report

in its entirety as the court's findings of fact with one

exception, and that is that I've granted the objection to the

two-level enhancement for restraint.

All right.  Mr. Hollomon, if you want to come forward.

There was something else?

PROBATION OFFICER:  I apologize, Your Honor.  I think

we were correct the first time.  His total history score is

three points minus the one that we conceded.  But that -- even

that -- a two or three points would be a criminal history

category of II, not III.

MR. HOLLOMON:  Your Honor, we were looking at that.

That is what is in paragraph 77 of the PSIR.  So I think it is

a criminal history category II.  And the one point that was

1  conceded didn't materially change that.

2         PROBATION OFFICER:  Your Honor, the guideline

3  imprisonment range before the two levels that Your Honor

4  subtracted was 188 to 235.  That was stated correctly.  So a

5  category II at a level 33 would be 151 to 188.

6         THE COURT:  All right.  Mr. Rushing.

7         MR. RUSHING:  Yes, Your Honor.

8         THE COURT:  Looks like a criminal history category of

9  II?

10        MR. RUSHING:  Yes, Your Honor, because it was III, and

11 giving one back makes it a total of two points, I believe,

12 which is a category II.

13        THE COURT:  Okay.  All right.  So a 35 with a II would

14 be 188 to 235 months.  A 33 and a II would be 151 to 188

15 months.  Is that right?

16        MR. RUSHING:  Yes, Your Honor.

17        MR. HOLLOMON:  Yes, Your Honor.

18        THE COURT:  Okay.  Let me -- just for the record, I

19 did receive some letters that I have read.  I also received an

20 e-mail yesterday from Zachary Hodge that I read.  And I'll

21 attach all those to our record.  All right.

22        Mr. Hollomon, if you want to come forward with your

23 client for allocution.  Do you want to do that first?  You said

24 you had some witnesses you wanted --

25        MR. HOLLOMON:  Your Honor, I would have two character

```
 1   witnesses I'd like to call briefly.  And I can either have them

 2   take the witness stand, Your Honor, or just speak from the

 3   podium.  Witness stand?  I'd like to call Semiya Shelby.

 4                         SEMIYA SHELBY,

 5   having first been duly sworn, testified as follows:

 6                       DIRECT EXAMINATION

 7   BY MR. HOLLOMON:

 8   Q.  I'm going to ask you to keep your voice up so the court

 9   reporter can take down what you're saying.  Okay?

10   A.  Okay.

11   Q.  State your name for the record.

12   A.  Semiya Shelby.

13   Q.  And, Semiya, what is your relationship to Marcus Shelby?

14   A.  Daughter.

15   Q.  Okay.  How old are you?

16   A.  Huh?

17   Q.  How old are you?

18   A.  14.

19   Q.  Okay.  And do you have something you'd like to tell the

20   court about your dad?

21   A.  He's a good man.  I would like to have my father home with

22   me.  I would want him to be here when I graduate high school.

23   I don't --

24   Q.  Are you a little nervous here today?

25   A.  (Nods head affirmatively)
```

```
1    Q.  Okay.

2            MR. HOLLOMON:  That's all I have, Your Honor.

3            THE COURT:  All right.  Thank you.  Any --

4            MR. RUSHING:  No, Your Honor.

5            MR. HOLLOMON:  Your Honor, we would call Pastor

6    Rozell.

7            THE WITNESS:  How you doing, Your Honor?

8            THE COURT:  Good.

9                        HARRISON ROZELL,

10   having first been duly sworn, testified as follows:

11                      DIRECT EXAMINATION

12   A.  How you doing?

13   BY MR. HOLLOMON:

14   Q.  Hi, pastor.  I'm going to ask you if you would to state

15   your name, and speak into that microphone so that we can all

16   hear you.  And spell your last name if you would.

17   A.  R-O-Z-E-L-L.

18   Q.  Okay.  And your first name?

19   A.  Harrison.

20   Q.  Okay.  And where do you live and what do you do for a

21   living?

22   A.  I live in Jackson and I have a lawn service.

23   Q.  Okay.  And do you also pastor a church?

24   A.  Yes, sir.  I pastor a church in Edwards, Mississippi.

25   Q.  Okay.  How long have you been doing that?
```

```
 1    A.    17 years.

 2    Q.    Okay.   And do you know Marcus Shelby?

 3    A.    Yes, sir.   He's my nephew.

 4    Q.    Okay.   And do you know him well?   Have you known him all

 5    his life?

 6    A.    Yes, sir, all his life.

 7    Q.    What would you like to tell the court about him before

 8    sentence is imposed in this case?

 9    A.    I would just like to ask the court to mercy -- to show

10    mercy on him and if -- if it's any way possible.   And I recall

11    what my grandmother used to always tell us, that it's easy to

12    get in trouble, but it's hard to get out.   And I think if, you

13    know, he had a chance to do -- do it over, I think he'll do --

14    you know, do it different.

15          I don't know nothing about all this stuff that you all

16    talking about, but I do know it's -- what's going on in society

17    now, the polices do make -- make people a little scared.   And I

18    think maybe what went on with the police, that he just was

19    scared that maybe he was going to be shot.   And, you know,

20    that's all I can say.

21          I just ask if you -- you know, if it's any way possible,

22    Judge, for you to show mercy on this situation, that you would,

23    you know.

24    Q.    Thank you, pastor.

25                MR. HOLLOMON:   Thank you, Your Honor.
```

1          THE COURT:  Any questions, Mr. Rushing?

2          MR. RUSHING:  No, Your Honor.

3          THE COURT:  All right.  Thank you.  All right.

4      (THE COURT AND COURT REPORTER CONFERRED)

5          THE COURT:  As you know, you have the right of

6   allocution and you can tell me whatever you think I should know

7   before the sentence is imposed.  I'm going to let you speak.

8   I'll also let Mr. Hollomon speak if you'd like for him to speak

9   also, but this is your opportunity to exercise that right.

10         THE DEFENDANT:  Good evening, Your Honor.  Good

11  evening, everybody.  I want to apologize for the mistake I

12  made.  I let my father down.  I want to apologize to the court.

13  These last ten months' been really hard on me.  I ain't never

14  been in jail before, because I -- and I never ever tried to

15  hurt anyone in life.

16          I've been shot, been robbed and different things, and

17  I ain't never tried to retaliate, because I always left it up

18  to the Lord.  And I apologize to Officer Townsend for pulling

19  off on him.  I want to apologize to my wife and my daughter, my

20  grandma, aunties and cousins.  And I really want to just

21  apologize to everybody and apologize to the court and ask them

22  to have mercy.  I'm going to apologize for even being here.

23          I don't like no courtroom.  I ain't never liked no

24  courtroom.  And I made a mistake.  I made some mistakes and it

25  got me here.  And I just -- just pray to the Lord that he see

1    me go through what I'm going through and get me back to my

2    family.

3            And I just ask you, Mr. Jordan -- Mr. Jordan, please

4    have mercy on me.  150 -- 50 how many ever months, that's a

5    long time to be away.  You know, these ten months done hurt me.

6    I got married.  Like two months before I got married I got in

7    trouble.  Two months from my one year anniversary I'm in jail.

8            And I ain't -- I called myself getting married, my dad

9    told me, he said, *Son, you're fixing to get married.  The devil*

10   *will come at you all different type of ways.*  And he have.  And

11   I ain't mean -- I ain't mean to do none of this, but I just --

12   just made some mistakes, and I'm sorry.  I really am.  From the

13   bottom of my heart I am sorry.  You'll never see me again.

14   You'll never see me again because I ain't coming back.  I'm

15   not.

16            THE COURT:  All right.

17            MR. HOLLOMON:  Your Honor, I would say that my

18   client's problem is rooted in substance abuse, and I think

19   that's what triggered this episode that has him before the

20   court here today.  He was weak, fell prey to it, and here he

21   is.

22            And I think he does have a good heart.  I think he

23   does love his family.  He's got to overcome the substance abuse

24   issue that he's dealt with in his life to move forward.  And we

25   would ask the court to recommend him for the longest drug

1  program available in the federal system while he's doing his

2  time so he, hopefully, could come out and will not repeat this

3  behavior and will be a benefit to his family and his children

4  and move forward with his life in a purposeful way.  Thank you,

5  Your Honor.

6          THE COURT:  All right.  Thank you.  Mr. Rushing,

7  anything further from the government?

8          MR. RUSHING:  No, Your Honor, other than we did make a

9  recommendation in the plea supplement and we stand by that

10 recommendation, Your Honor.

11         THE COURT:  Okay.  All right.  We're going to take a

12 recess here.  We'll come back and enter the sentence.  Court's

13 in recess.

14    (RECESS)

15         THE COURT:  Thank you.  You may be seated.

16         MR. RUSHING:  Your Honor, if I may, I just want to

17 make the record clear -- keep the record clean on this.  I did

18 have an exhibit, Exhibit Number 10, I needed to make sure to

19 make that a part of the record also, Your Honor.  We talked

20 about it and I showed it to Joe.

21         MR. HOLLOMON:  No objection.

22         THE COURT:  All right.  Exhibit 10 will be admitted.

23    (EXHIBIT G-10 MARKED)

24         THE COURT:  All right.  As in any case I have to look

25 at the factors under 18 U.S.C. Section 3553(a) and impose a

1   sentence that's sufficient but not greater than necessary to

2   accomplish the goals of that statute.  As I mentioned before,

3   there's a guideline range of 151 to 188 months.  There's a

4   statutory minimum of five years and a statutory maximum of 40

5   years.

6        Included in the 3553(a) factors, I am required to

7   consider the guideline provisions and policy statements.  The

8   guidelines are advisory only.  I'm not required to follow them.

9   But I always approach sentencing by first determining whether a

10  sentence within the guideline range is sufficient but not

11  greater than necessary to accomplish the statutory goals.

12       One way to look at that is to ask whether the offense

13  in front of me and the other factors fall outside of the

14  heartland of cases to which the guidelines were designed to

15  address.  In this case I believe that a guideline range is

16  sufficient and not greater than necessary to accomplish the

17  statutory goals.

18       I would note that in some respects the defendant came

19  awfully close to losing his acceptance of responsibility.

20  There are a number of statements that were made to the

21  probation officer in the presentence report and also in his

22  letter to me where he was denying relevant conduct.  Had he

23  lost that acceptance of responsibility, then the guideline

24  range would have been 210 to 262 months.

25       Mr. Hollomon, frankly, had you not withdrawn the first

objection regarding the drug quantities, then we would have had

a long conversation about acceptance of responsibility.  Even

with that concession, it was still a close call.

The first thing I look at under the statute are the

nature and circumstances of the offense and the history and

characteristics of the defendant.

Mr. Shelby, I go through these things because I am

required to.  I'm not trying to embarrass you in front of your

family, but I am required to make a record of why I've selected

the sentence that I have and why it falls where it does within

the guideline range.

And with respect to the history and characteristics of

the defendant, what I have in front of me is a -- I guess a

mixed bag.  The letters I've read all indicate that the

defendant is honest, respectful.  The word "gentle" I think was

used.  But the record I have in front of me is not consistent

with that.

When the defendant met with the probation office to

accept responsibility, he made it sound as though his

codefendant Mr. Nunez had put the drugs in his car without his

knowledge.  He said a similar thing to me in the letter that he

wrote.  But that's not consistent with the presentence report.

Paragraph 17 -- and this bleeds into the nature and

circumstances of the offense.  But paragraph 17, to which there

were no objections, says that the defendant had been supplying

1  kilo quantities of crack cocaine to Charlie Martin.  On

2  October 25, 2015, the date where he was pulled over, there were

3  a series of recorded telephone conversations between Mr. Shelby

4  and his codefendants and conversations with others confirming

5  that the defendant had agreed to pick up and sell crack

6  cocaine.  And, in fact, he arrived at the stash house as agreed

7  on those conversations.

8          And he was surveilled by officers arriving in the

9  silver Toyota, and he was immediately pulled over after that.

10  When he fled in the car, he took the crack cocaine with him.

11          After all of that, there are other telephone

12  conversations that were recorded between the defendant and

13  others indicating that he had picked up the two kilos that day.

14  I just find it impossible to believe that a crack dealer would

15  put two kilos of crack in somebody's car and not tell them

16  about it.  And in any event -- yes, sir.

17          MR. RUSHING:  Your Honor, I believe that's cocaine

18  hydrochloride instead of crack.

19          THE COURT:  Okay.  I'm sorry.  Exactly.  In any event,

20  the items found in the defendant's car on October 25th include

21  what the law would refer to as tools of the trade, including

22  razor blades, white powdery substance, rolling papers, rubbing

23  alcohol, multiple paper bags and small plastic sandwich bags

24  plus the loaded .22 caliber Ruger and a box of .22 caliber

25  hollow-point cartridges.  All that is to say that the story the

1    defendant told probation and me about cars being left -- I'm

2    sorry -- drugs being left in his car does not ring true.

3             I also have the incidents that occurred at the traffic

4    stop with Officer Townsend.  When the defendant met with

5    probation, he said that he fled because he was scared but

6    pulled over moments later.  Well, that hardly tells the true

7    story.

8             As we've heard today, Officer Townsend was dragged by

9    the vehicle.  The defendant crashed into at least two other

10   cars, causing substantial damage to his Avalon.  He drove

11   through the city, through a park, and eventually abandoned the

12   vehicle.

13            I would also note -- and I won't go through it all

14   because it's in the presentence report, but this is obviously

15   not the defendant's first issue with a drug offense.  And he

16   also has substance abuse issues that appear to go back to at

17   least when he was 21 years old.  He indicated that he smokes a

18   blunt a day since he was 21.

19            I don't believe that any human being is all good or

20   all bad.  The real world is more complex than that.  And I have

21   no doubt that the defendant obviously has a supportive family

22   that wants the best for him.  But I also have a history of

23   drug-related issues and I have a history of a drug-related

24   offense.  I have the record and the telephone conversations

25   that were recorded when he didn't think anybody was listening

1    indicating that he was involved in the sale of drugs.

2           The sentence must also reflect the seriousness of the

3    offense, promote respect for the law and provide just

4    punishment.  On this count the defendant stated that this was

5    not a violent offense; but, candidly, drug offenses involving

6    drugs as addictive as this are harmful to society.

7           And I also have to make sure that the sentence would

8    provide adequate deterrence and protect the public from further

9    crimes of the defendant.  There are other factors, but the ones

10   that I've listed are the ones that I think are most relevant in

11   this case.

12          And it's the judgment of the court that the defendant,

13   Marcus Lashun Shelby, be sentenced to a 180-month term of

14   imprisonment as to Count 1 and a partial fine of $1,500.  This

15   term of imprisonment shall be followed by a four-year term of

16   supervised release.  The term of supervised release is subject

17   to the standard and mandatory conditions as listed on the

18   judgment order in addition to the following special conditions.

19          First, he shall provide the probation office with

20   access to any requested financial information in light of

21   having the fine.

22          Second, you shall not incur new credit charges or open

23   additional lines of credit without the approval of the

24   probation office unless you are in compliance with the

25   installment payment schedule.

1          Third, you shall participate in a program of testing

2     and/or treatment for alcohol or drug abuse as directed by the

3     probation officer.  You shall abstain from consuming alcoholic

4     beverages and shall continue abstaining for the remaining

5     period of supervision.  You shall contribute to the cost of any

6     treatment in accordance with the probation office co-pay

7     policy.

8          Fourth, and also based on the history of drug use, you

9     shall not possess, ingest or otherwise use a synthetic

10    cannabinoid or other synthetic narcotic unless prescribed by a

11    licensed medical practitioner.

12         Finally, you shall submit your person, property,

13    house, residence, vehicle, papers or office to a search

14    conducted by a United States probation officer.  Failure to

15    submit to a search may be grounds for revocation of release.

16         You shall warn any other occupants that the premises

17    may be subject to searches pursuant to this condition.  An

18    officer may conduct a search pursuant to this condition only

19    when reasonable suspicion exists that you have violated a

20    condition of your supervision and that the areas to be searched

21    contain evidence of this violation.  Any search must be

22    conducted at a reasonable time and in a reasonable manner.

23         With respect to the fine, it is payable immediately

24    and during incarceration.  Any balance remaining upon release

25    from imprisonment shall be paid in monthly installments of no

1   less than $100 beginning 60 days after release from

2   imprisonment.

3            In the event the fine is not paid in full prior to the

4   termination of supervised release, you are ordered to enter

5   into a written agreement with the Financial Litigation Unit of

6   the United States Attorney's Office for payment of the

7   remaining balance.

8            Additionally, the value of any future discovered

9   assets may be applied to offset the balance of criminal

10  monetary penalties.  You may be included in the Treasury Offset

11  Program allowing qualified federal benefits to be applied to

12  offset the balance of criminal monetary penalties.

13           It's further ordered that the defendant pay the

14  mandatory special assessment of $100, which is due immediately.

15           Mr. Rushing, I didn't look back.  Was there a

16  preliminary forfeiture order regarding the firearm or anything

17  else?

18           MR. RUSHING:  No, Your Honor.

19           THE COURT:  All right.  Mr. Shelby, when you entered

20  your plea, you waived or gave up some of your rights to appeal;

21  but to the extent there's any issue that can be appealed, it

22  has to be appealed in a timely manner, which is generally 14

23  days.

24           Mr. Hollomon, have you discussed that with your

25  client?

1          MR. HOLLOMON:  No, Your Honor.

2          THE COURT:  I'll ask you to discuss it when we're

3   finished here.  Is there anything further from the government?

4          MR. RUSHING:  Your Honor, the government will move to

5   dismiss the remaining count of the indictment as to the

6   defendant.

7          THE COURT:  Submit the order and I'll be happy to sign

8   that.  Anything further from -- oh.  Mr. Hollomon, based on the

9   I guess longstanding substance issues that are reflected in the

10  presentence report, I will request that the defendant be

11  considered for the 500-hour intensive drug treatment program.

12  Are there any requests with respect to where he serves his term

13  of incarceration?

14         MR. HOLLOMON:  Your Honor, my client would request

15  that the court recommend to the Bureau of Prisons that he be

16  designated to the Federal Correctional Institute in Yazoo City.

17         THE COURT:  All right.  I'll make that recommendation.

18  It's obviously not up to me, but I can make a recommendation

19  and I'll do that.  Mr. Shelby, you wanted to say something?

20         THE DEFENDANT:  Yes, sir.  I have the two points that

21  I got and then plus the other point and I still got 15 years?

22         THE COURT:  That's a fact.

23         Anything else, Mr. Hollomon?

24         MR. HOLLOMON:  No, Your Honor.

25         THE COURT:  All right.  The defendant's remanded to

1    the custody of the United States marshals and we're adjourned.

2            MR. HOLLOMON:  Thank you, Your Honor.

3        (HEARING CONCLUDED)

1                           CERTIFICATE OF REPORTER

2

3          I, MARY VIRGINIA "Gina" MORRIS, Official Court

4     Reporter, United States District Court, Southern District of

5     Mississippi, do hereby certify that the above and foregoing

6     pages contain a full, true and correct transcript of the

7     proceedings had in the aforenamed case at the time and

8     place indicated, which proceedings were recorded by me to

9     the best of my skill and ability.

10         I certify that the transcript fees and format

11    comply with those prescribed by the Court and Judicial

12    Conference of the United States.

13         This the 1st day of June, 2018.

14

15                         s/ Gina Morris
                           _____
16                         U.S. DISTRICT COURT REPORTER

17

18

19

20

21

22

23

24

25